**UNITED STATES of America**

v.

**Robert WOLK.**

**Crim. No. 74–305.**

United States District Court,
E. D. Pennsylvania.

July 31, 1975.

Robert F. Haley, II, Sp. Atty., Joseph Kiel, Organized Crime & Racketeering Section, Crim. Div., Philadelphia Strike Force, Philadelphia, Pa., for plaintiff.

Mark S. Levy, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER

BRODERICK, District Judge.

This matter comes before the Court on the defendant's Motion for a New Trial or, in the alternative, for a Judgment of Acquittal after a jury verdict of guilty on the count charged in the indictment. The count upon which the defendant was found guilty is as follows:

COUNT I: That from on or about October 26, 1973, up to and including February 15, 1974, in the Eastern District of Pennsylvania, and elsewhere

ANTHONY MERLINO, a/k/a TONY
ANN MERLINO
ALBERT CARTER, a/k/a AL
JOEL BARBALOCK
KENNETH COOPER
ROBERT WOLK
WILLIAM CASPERSON
JOSEPH CROGHAN
MARGARET DEL CONTE, a/k/a MAGGIE

defendants herein, and Joseph McCreary, a/k/a Big Joe, Edward J. Troise, Jr., Mark A. Hirsch, Richard Erwin, a/k/a Richie, Maurice Altamuro, a/k/a Moe, Stuart Kellerman, Richard Bear, a/k/a Alfie, Miles Taylor, named as co-conspirators but not as defendants herein, wilfully, knowingly, and intentionally did combine, conspire, confederate and agree together, with each other and with diverse other persons whose names are to the Grand Jury known and unknown, to manufacture, distribute, dispense and possess, with intent to manufacture, distribute and dispense, methamphetamine, amphetamine, cocaine, pentabarbital, phexcyclidine and other controlled substances, as listed in the Schedule of Controlled Substances in Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 841(a)(1).

Robert Wolk was tried alone on this count since all the other named conspirators, with the exception of William Casperson, whose trial was severed,[1] had previously pleaded guilty to the conspiracy charge or other counts in the indictment.

The defendant's motion has raised five issues for the Court to decide.

1. Did the admission of a hearsay statement of a co-conspirator violate the defendant's right of confrontation?

2. Did the Court err in permitting the Government to use evidence obtained from a search of the defendant's wallet?

3. Did the Court err in permitting the Government to use a photograph taken by a government agent of chemicals and chemical equipment?

4. Did the Court err in permitting a Government witness, John Fascinello, to testify as an expert?

5. Did the Court err in not directing a mistrial when the attorney for the Government referred to the United States of America as his "client"?

1. *Did the admission of hearsay statements of co-conspirators violate the defendant's right of confrontation?*

At 7:45 p. m. on October 26, 1973, James Bannister, a Special Agent with the Drug Enforcement Agency (DEA), was introduced by informer William Casperson to Anthony Merlino and his wife, Ann Merlino, at the Merlinos' apartment. At this meeting, Agent Bannister purchased approximately 5½ ounces of cocaine from Mr. Merlino for $2,700.00 and initiated discussions concerning the possibility of a future purchase of two pounds of methamphetamine in exchange for five gallons of a chemical, phenyl–2–propanal (P–2–P), which is used to manufacture methamphetamine. During the discussions con-

---

1. William Casperson, after the severance of his case, eventually pleaded guilty to this conspiracy count.

cerning the future drug deal, Mr. Merlino stated to Agent Bannister that an individual referred to as "Al" would control the methamphetamine transaction. At a subsequent meeting held on November 1, 1973, Special Agent Vincent Moran, also with DEA, was introduced to Anthony Merlino as an associate of Agent Bannister. At two subsequent meetings at Mr. Merlino's apartment, Agents Bannister and Moran discussed with Mr. Merlino the proposed methamphetamine for P–2–P transaction and learned more about "Al", including the fact that he worked in Pennsauken, New Jersey for an establishment known as Mirror Magic, Inc. Finally, on November 21, 1973, Agents Bannister and Moran, together with Mr. Merlino, went to Mirror Magic and met "Al", whose full name is Albert Carter. Mr. Carter supplied the Agents with a sample of the methamphetamine which they would receive in exchange for their five gallons of P–2–P and stated this his "chemist" was currently working on a batch of methamphetamine which was supposed to be finished by November 26, 1973. Mr. Carter instructed the Agents to contact Mr. Merlino to make the final arrangements for the exchange. However, no exchange took place and on November 29, 1973, Mr. Merlino informed Agent Bannister that the scheduled exchange had been called off because Mr. Carter was apprehensive.

Finally, on January 10, 1974, at approximately 11:50 p. m., Mr. Merlino telephoned Agent Bannister and asked if he had the P–2–P ready to exchange. Agent Bannister replied that he did and Mr. Merlino said that he would contact Agent Bannister when he had the methamphetamine in his possession. Early in the afternoon on January 11, 1974, Agents Bannister and Moran arrived at Mr. Merlino's new house located in Harleysville, Pennsylvania, carrying the five gallons of P–2–P in three red two-gallon gasoline cans. Present at this meeting were Agents Bannister and Moran and Mr. Merlino and Mr. Carter. Mr.

Carter stated that he would not release the methamphetamine until the P–2–P had been sampled by some unknown person, referred to as "his man". The Agents, Mr. Merlino and Mr. Carter then agreed that Mr. Carter would deliver the P–2–P to whomever was designated in order to have the chemical checked and that the Agents and Mr. Merlino would meet at 19th and Sansom Streets in Philadelphia, at approximately 4:00 p. m. to finalize the transaction. Shortly after 4:00 p. m., the Agents and Mr. Merlino met with Mr. Carter at 19th and Sansom Streets and Carter stated that the P–2–P was satisfactory.

After leaving Mr. Merlino's residence in his car at approximately 2:25 p. m. with the three red gas cans, Mr. Carter was placed under moving surveillance by DEA agents. Mr. Carter drove directly from Harleysville, Pennsylvania to a parking lot located near Eighth and Sansom Streets in Philadelphia. He arrived at the lot at 3:20 p. m., took the three red gas cans out of his car, and proceeded with the cans to the General Radio and TV shop located at 801 Sansom Street. The defendant is a partner in the General Radio and TV shop located at that address. At about 3:50 p. m., Mr. Carter left General Radio and TV without the three red gas cans.

Beginning at the time Mr. Carter left the three red gas cans at 801 Sansom Street, General Radio and TV was kept under constant surveillance by DEA agents. At about 5:00 p. m. on January 17, 1974, the defendant left his place of business at 801 Sansom Street and entered a white Lincoln Continental and drove past his store and around the block approximately three times. He then parked his car opposite his store at 801 Sansom Street and entered the premises. Within five minutes the defendant re-appeared in the doorway of 801 Sansom Street carrying three red gas cans, proceeded to his car and placed the three red cans in his car trunk. The defendant then returned to his store and approximately ten minutes later locked

the store and left the area. The defendant was then followed up Broad Street in Philadelphia to Germantown Avenue. He then circled a block in the Germantown area three times and temporarily evaded the Government surveillance. The car was located again parked on the south side of Germantown Avenue. The defendant is the owner of a second establishment known as General Radio and TV, located on Germantown Avenue in Philadelphia. Surveillance of the defendant then continued for approximately ten days.

The Government also produced testimony, based upon the records of the Bell Telephone Company of Pennsylvania[2] and the records of the New Jersey Bell Telephone Company,[3] that for the period encompassing August, 1973 to January, 1974 at least 15 long distance telephone calls were made from the defendant's phone located at 801 Sansom Street to Mirror Magic, Inc., Mr. Carter's place of business, and that at least 32 long distance telephone calls were placed from Mirror Magic, Inc., to 801 Sansom Street, Philadelphia. The Government also introduced into evidence a telephone book taken from the person of Albert Carter by Officer Zajak of the Bensalem Township Police Department, Bucks County, Pennsylvania on January 16, 1974, which was later given to Agent Bannister. In this phonebook, under the name "Bob", was listed the home phone number of the defendant, as well as his business numbers at the Germantown store and the store located at 801 Sansom Street. Further testimony by the Government revealed that for approximately two years prior to his arrest, the defendant had purchased various chemicals and laboratory equipment from a distributor called Scientific Equipment Company located in Philadelphia and that these purchased chemicals and equipment were useful, and in some cases necessary, in the manufacturing of methamphetamine.

The Government also introduced the hearsay statement of Albert Carter made to Agents Bannister and Moran at a meeting held on February 6, 1974, the purpose of which was to discuss another large methamphetamine transaction. Mr. Carter was pressed at this meeting for an explanation as to the reason for the delay in consummating this second transaction. Mr. Carter stated that the delay was caused by the fact that his contact believed that he was being followed by the F.B.I. Mr. Carter said that his "man" drove a white vinyl topped Lincoln Continental Mark IV with white interior and owned two stores, one of which was located in an all black area in Germantown. He further described this individual as a white Jewish male who was a younger man and drew suspicion from the other store owners who were in his area because these people were apparently much older than he. (N.T. 6–16, 7–79). This description of Mr. Carter's "man" identified the defendant. Objection was made that the hearsay statement violated the defendant's Sixth Amendment right to confront his accusers.

The general rule is that a declaration by one co-conspirator, made in furtherance of the conspiracy and during its pendency, is admissible against each co-conspirator provided a foundation is laid for its admission by independent proof of the conspiracy and the linkage of the defendant to the declarant. *United States v. Rodrigues,* 491 F. 2d 663 (3d Cir. 1974); *United States v. Bey,* 437 F.2d 188 (3d Cir. 1971). The judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether the de-

2. Exhibit G–16.

3. Exhibit G–17.

fendant is guilty beyond a reasonable doubt. *United States v. Geaney*, 417 F. 2d 1116 (2d Cir. 1969); *United States v. Bey*, 437 F.2d 188 (3d Cir. 1971). Furthermore, where the existence of the conspiracy is established by proof *aliunde*, slight evidence is sufficient to connect a defendant with the conspiracy. *United States v. Kates*, 508 F.2d 308 (3d Cir. 1975).

■ In the instant case, clearly, there was sufficient evidence, independent of the hearsay statements, to submit the defendant's participation in the alleged conspiracy to the jury. Prior to permitting testimony of the hearsay statement, the Court ruled that such a foundation had been established by the Government's evidence. The prior evidence disclosed that the Agents, Merlino and Carter agreed to exchange a quantity of methamphetamine for the Agents' P-2-P, but that an unknown person's approval of the chemical was required. After the exchange, the cans containing the P-2-P were traced directly into the defendant's possession, linking the defendant to the conspiracy. We find that there was sufficient proof *aliunde* to submit the issues of the existence of a conspiracy and the defendant's connection with it to the jury.

Defendant contends, however, that in the circumstances of this case, the admission into evidence of Carter's hearsay statement to the Agents violated his right of confrontation. Reliance is placed by the defendant on the case of *Park v. Huff*, 493 F.2d 923 (5th Cir. 1974). That case held that where hearsay testimony introduced against the defendant under Georgia's co-conspirator exception to the hearsay rule was "crucial" and "devastating" and was not supported by significant indicia of reliability, and where the declarants were not shown to be unavailable to testify at trial, its introduction violated the accused's Sixth Amendment right of confrontation. The Court held that the rules of evidence must comply with the constitutional requirements of the Sixth Amendment. The *Park* Court made it clear that its decision was based upon the particular facts of the case before it and was grounded on an evaluation of the trustworthiness and accuracy of the testimony offered.

■ The Supreme Court has made it plain that although the confrontation clause of the Sixth Amendment and the hearsay rule overlap, the two are not co-extensive. Thus, even statements properly admitted under hearsay rules may be examined by the Court to assure that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Menichino*, 497 F.2d 935 (5th Cir. 1974). The mission of the confrontation clause is to assure that such a basis is provided, whether the evidence is hearsay or non-hearsay and whether the satisfactory basis for such a truth evaluation is provided by cross-examination or otherwise. *Hoover v. Beto*, 467 F.2d 516 (5th Cir. 1972). A case by case analysis is necessary to determine whether, under the circumstances, the unavailability of the declarant deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration. If so, and if the challenged testimony is "crucial" to the prosecution or "devastating" to the defense, it must be excluded. *Menichino, supra* at 943.

■ Unlike the situation in *Park*, the challenged testimony in this case was neither "crucial" nor "devastating".[4] In

---

4. In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Supreme Court enunciated the concept of "crucial" or "devastating" hearsay and other factors which might lead to a violation of the defendant's right of confrontation.

This case does not involve evidence in any sense "crucial" or "devastating," as did all the cases just discussed. It does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation, as did *Douglas*, [*Douglas v.*

*Park,* the hearsay statements of co-conspirators were the only evidence linking the defendant to the murder conspiracy there involved. In the instant case, there is ample independent non-hearsay evidence of the existence of a conspiracy and the defendant's membership in that conspiracy, without Albert Carter's statement as to his "man". Therefore, although the hearsay statements in this case are undoubtedly damaging to the defendant and may have lessened his hopes of acquittal, they are not crucial in the sense referred to in *Park.*[5] Further, in our case, unlike *Park,* the hearsay testimony which indicated that the defendant was part of a conspiracy was surrounded by sufficient indicia of reliability to establish a satisfactory basis for the jury to evaluate the truth of the extrajudicial declaration even in the absence of cross-examination. *California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The statement was made spontaneously by Albert Carter, during the course of the conspiracy, while discussing with agents who had gained his confidence the details of their drug dealings. The Court is not aware of any motive which Mr. Carter would have had to mislead the agents as to the description of his "man".[6] These factors, together with the finding that the statement meets the requirements of a recognized exception to the hearsay rule, point to the reliability of these hearsay statements and serve as an adequate substitute for the right of cross-examination for purposes of the confrontation clause.

■ Defendant also argues that the Government has failed to establish that the declarant, Carter, was unavailable to testify and this fact, coupled with the crucial nature of the testimony, has denied him his constitutional right of confrontation.[7] We have already found that the testimony was not crucial within the meaning of *Park* and was surrounded with sufficient indicia of reliability. We can find no support for the conclusion that the declarant must be unavailable or that the reasons must be shown why the declarant was not called to testify before a hearsay statement is admissible in a criminal trial. *Dutton v. Evans,* 400 U.S. 74, 80, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). There is, furthermore, in this case a significant likelihood that the declarant would have successfully refused to testify on Fifth Amendment grounds and was, therefore, unavailable. See *Hoover v. Beto,* 476 F. 2d 516, 540 (5th Cir. 1972). It is true that the Government did not call Carter to testify but it did inform the Court that Mr. Carter's attorney had stated that Mr. Carter would refuse to testify on Fifth Amendment grounds. At that point Carter had pleaded guilty before

---

Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934] Brookhart, [*Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314] Bruton, [*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476] and Roberts, [*Roberts v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100]. It does not involve any suggestion of prosecutorial misconduct or even negligence, as did Pointer, [*Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 923] Douglas, and Barber, [*Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255]. It does not involve the use by the prosecution of a paper transcript, as did Pointer, Brookhart, and Barber. It does not involve a joint trial, as did Bruton and Roberts. And it certainly does not involve the wholesale denial of cross-examination, as did Brookhart. None of these factors are present in our case.

5. The hearsay statement by Carter took on even less significance as the trial progressed. The issue became one of credibility and whether the jury believed the defendant's assertions that his relationship with Carter and with the three red gas cans was innocent.

6. In *Park,* the hearsay statement was made after the co-conspirator's arrest during the concealment stage when a hearsay statement placing the blame on other co-conspirators is inherently less trustworthy than one made during the pendency of, and in furtherance of, the conspiracy.

7. If it can be shown that a declarant is unavailable to testify, the necessity of hearing the testimony against the defendant may well require the admission of the hearsay statement. *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1894).

this Court to two counts of an indictment which charged him in four counts and was awaiting sentencing by this Court. The remaining two counts were not to be dismissed by the Government until sentencing. It would seem that Carter could have successfully invoked the privilege. *United States v. Gloria,* 494 F.2d 477 (5th Cir. 1974); *United States v. Johnson,* 488 F.2d 1206 (1st Cir. 1973); *Mills v. United States,* 281 F.2d 736 (4th Cir. 1960); *McCormick on Evidence,* § 121 at 257 (2d Ed. 1972).

For all the foregoing reasons, we hold that the defendant's right to confrontation was not violated by the admission of the hearsay statement of a co-conspirator.[8]

2. *Did the Court err in permitting the Government to use evidence obtained from a search of the defendant's wallet?*

At trial, the Government introduced certain business records of Scientific Equipment Company which consisted of five receipts which showed that the defendant's company, General Radio and TV, had purchased various chemicals and laboratory equipment from Scientific Equipment Company. Scientific Equipment Company sells and distributes laboratory chemicals, reagents and apparatus. The Government then introduced, through an expert, testimony which showed that the various chemicals and equipment could be used to manufacture methamphetamine. Defendant contended at trial that the business records evidence from Scientific Equipment Company was obtained as the fruit of an illegal search of the defendant's wallet, which wallet contained a purchase receipt from Scientific Equipment Company.

The Court held a suppression hearing, outside the presence of the jury, on November 8, 1974 during the trial of this case, pursuant to an oral motion by the defendant, to determine whether the Government had obtained the business records of Scientific Equipment Corporation as the result of an illegal search. Defendant's attack on the admission of the records of Scientific Equipment Company required the Court to undertake a two step inquiry. The Court was required to determine whether the wallet and the receipt were obtained from an illegal search and, if so, whether the Government's discovery of the records of Scientific Equipment Company was the product of that illegal search. The following facts were presented at the hearing. At approximately midnight on May 29, 1974, Government agents, acting pursuant to a valid arrest warrant issued following the defendant's indictment by a Grand Jury, appeared at the defendant's home in Philadelphia, Pennsylvania to effectuate his arrest. The defendant who was upstairs in his home watching television, answered the agents' knock on his door and was informed that he was under arrest. Agent Mignault, one of the arresting officers, testified that as part of their normal routine, the defendant was requested to produce some type of personal identification. Since the defendant had no identification at that time, he called upstairs to his wife and instructed her to bring down his wallet which contained his driver's license. Pursuant to the direction of the arresting agents, Mrs. Wolk placed the wallet on the steps leading downstairs so that the agents could be certain that no weapons were involved. After the wallet was briefly examined by the agents, it was placed by them in the defendant's back pocket and he was taken to the DEA offices for processing. It was during this routine processing at the DEA offices that the defendant's wallet

---

8. It is interesting to note that the defendant made no objection when recordings of phone conversations revealed a statement by Anthony Merlino, a co-conspirator, made to a Government agent that Mr. Carter was having trouble arranging a drug deal because his guy was being tailed and described Carter's guy as a white person with a white Mark IV who was doing things in a black neighborhood. (TRANSCRIPT OF PHONE CONVERSATIONS, REEL A3, Log 56, February 3, 1974).

was searched and the Scientific Equipment Company receipt was found. We accept this testimony of the Government agents as credible as to what occurred on the night of the defendant's arrest.

The testimony of the defendant and Mrs. Wolk did not differ substantially from that of Agent Mignault as to what occurred on the night of the defendant's arrest. However, both testified that when the defendant asked Mrs. Wolk to bring down his wallet which contained his driver's license, she handed the wallet to the defendant. Their testimony was that the defendant withdrew his license from the wallet, showed the license to the arresting agents, and then returned the wallet to his wife. According to the defendant and Mrs. Wolk, it was then that the agents seized the wallet from Mrs. Wolk.

■■■ Under the principles laid down by the Supreme Court in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), a search incident to an arrest must be limited to the person of the defendant or the area under his control. The reasonableness of a search depends upon its particular facts and circumstances but must be limited in scope to the area necessary to protect the arresting officer's safety and to prevent the concealment or destruction of contraband or evidence. Even if we were to accept the defendant's version and were to find that the wallet was taken from the defendant's wife, there would be no question that at the time that the wallet was seized, it was within the defendant's immediate control. We find that the seizure and subsequent search of the wallet by the arresting officers was reasonable and lawful. See *United States v. Woods*, 468 F.2d 1024 (9th Cir. 1972).

■■ However, even if we were to find that the search of the wallet was improper, we would not suppress the testimony and documentary evidence concerning the business records of Scientific Equipment Company. To be inadmissible as the "fruit of a poisonous tree",

the Court must find that the business records were not obtained "from an independent source", but were the product of the illegal search and were "the fruit of the poisonous tree". *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

The Government's evidence, which was credible and uncontradicted, showed that the evidence found in the Scientific Equipment Company's business records was obtained entirely without reference to the receipt found in the defendant's wallet. The testimony showed that on January 16, 1974, pursuant to a search warrant, Lieutenant Theodore Zajac of the Bensalem Township Police, Bucks County, Pennsylvania entered and searched the apartment of Stephen Stein in Cornwells Heights, Pennsylvania. During the course of the search, which revealed evidence of illegal drug dealings, Albert Carter entered Mr. Stein's apartment. Pursuant to Lieutenant Zajac's request, Mr. Carter accompanied the police to their headquarters for futher questioning. Before leaving Mr. Stein's apartment, Lieutenant Zajac found, in the apartment, a sheet of paper with the names of chemicals written thereon, as well as the name Baker written after some of the chemicals. Lieutenant Zajac then contacted DEA Agent James Bannister and transmitted the document to him for whatever use he might find for it.

While reviewing the file in preparation for the trial of this case, Agent Vincent Moran found a xerox copy of the aforesaid mentioned paper. After further research, Agent Moran found that there was a J. T. Baker Chemical Company (Baker) located in Phillipsburg, New Jersey. Agent Moran then determined from Baker that it had three distributors in the Philadelphia area, one of which was Scientific Equipment Company. Agent Moran prepared a list of names associated with the present case and asked an investigator in the

DEA office to call the three local distributors and inquire as to whether they had ever dealt with any of the persons or companies on the list. General Radio and TV Company was included on Agent Moran's list and that name brought a positive response from Scientific Equipment Company. Thereafter, Agent Moran spoke with the proprietor of Scientific Equipment Company, Ronald McCutcheon, and procured from him the five invoices involved herein. Based upon these facts, we find that the Scientific Equipment Company business records and the testimony of Ronald McCutcheon were not obtained as the result of the search of the defendant's wallet, but were obtained as the result of the independent investigation conducted by the Government. For the foregoing reasons, the Court denied the defendant's motion to suppress.

3. *Did the Court err in permitting the Government to use a photograph taken by a Goverment agent of certain chemicals and chemical equipment?*

At trial, the Government introduced a photograph which showed the various chemicals and chemical equipment which the defendant had purchased from Scientific Equipment Company. The defendant contends that the Government placed the items all in one photograph in a manner which gave the appearance of a laboratory for the purpose of creating the inference that the defendant purchased the chemicals for use in a drug laboratory.

■ It is well settled that the admission of photographs rests largely in the trial court's discretion. *Burns v. Beto,* 371 F.2d 598 (5th Cir. 1967); *United States v. Odom,* 348 F.Supp. 889 (M.D.Pa.1972); *United States ex rel. Victor v. Yeager,* 330 F.Supp. 802 (D.C. N.J.1971). The photograph introduced here was helpful to explain the testimony concerning the chemicals and equipment the defendant purchased from Scientific Equipment Company. The Court carefully examined the photograph be-

fore admitting it into evidence and again after the trial and we can find no support for the defendant's contention that the items were arranged to depict a laboratory scene. Nor can we say that one viewing the photograph would find that it inadvertently has the appearance of a laboratory. Furthermore, the defendant, as part of his defense, brought into Court all the chemicals and chemical equipment which were shown by the business records of Scientific Equipment Company to have been purchased by the defendant. The jury not only had the Government's photograph but also the defendant's chemicals and chemical equipment and could determine for themselves whether the chemicals were to be used in a laboratory. Thus, there was no error in admitting the Government's photograph into evidence.

4. *Did the Court err in permitting the Government's witness, John Fascinello, to testify as an expert?*

■ At the outset of the trial, pursuant to the defendant's request, the Court ordered the sequestration of witnesses who were scheduled to testify. The defendant, in his defense, testified extensively concerning his business use of the chemicals which he had purchased from Scientific Equipment Company. In an effort to impeach this testimony of the defendant and in rebuttal of the defendant's explanation of his use of the chemicals which he purchased from Scientific Equipment Company, the Government presented John Fascinello, a DEA chemist who was present in court during the presentation of the defense. The defendant objected to the testimony of Mr. Fascinello on the grounds that permitting him to testify would violate the Court's prior sequestration order. The Government contended, however, that Mr. Fascinello was originally brought into court to aid it in the cross-examination of the defendant, and only after the defendant had testified at length concerning his use of the chemicals in question did it become apparent that his testimony as an expert would be required.

Sequestration of witnesses is a matter which is committed to the trial judge's sound discretion. *United States v. Strauss,* 473 F.2d 1262 (3d Cir. 1973); *United States v. Mallis,* 467 F.2d 567 (3d Cir. 1972). The purpose for sequestering a witness is "to prevent the shaping of testimony by witnesses to match that given by other witnesses." *United States v. Cozzetti,* 441 F.2d 344, 350 (9th Cir. 1971). In this case, Mr. Fascinello was called as an expert, not to corroborate the evidence which the prosecution presented in its case, but to rebut the defendant's testimony as to his use of the various chemicals which the defendant purchased from Scientific Equipment Company. Mr. Fascinello was not called as a fact witness and his testimony was limited to his expert opinion as to various chemical reactions. This expert opinion testimony required an informed factual basis upon which to base the opinion. The Court does not consider such an expert witness, who is called in rebuttal and whose questioning was confined to the effect of the use of certain chemical combinations, the use of which had been previously testified to by the defendant, to be within its sequestration order. In fact, at the time that the sequestration was ordered the Court stated that the order did not apply to rebuttal testimony. (N.T. 2–14).

Defendant further contends that Mr. Fascinello was not qualified to testify as an expert chemist. The competency of a witness to give an opinion concerning a matter of expertise lies largely within the trial court's discretion. *Salem v. United States Lines Company,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *United States v. Kienlen,* 415 F.2d 557 (10th Cir. 1969); *White v. United States,* 399 F.2d 813 (8th Cir. 1968); *United States v. Alker,* 260 F.2d 135 (3d Cir. 1958). Mr. Fascinello testified that he worked for the DEA as a forensic analytical chemist and had testified on numerous occasions for that agency. He stated that he was a college graduate with a Bachelor of Science degree in chemistry, had under-

gone chemistry training with the DEA, and was currently enrolled in graduate courses and was working toward a master's degree in Forensic Sciences. After finding Mr. Fascinello competent to testify as an expert, the Court instructed the jury that they should consider each expert opinion received in the case and give it only such weight as they thought it deserved and that they should disregard the opinion if not based upon sufficient education and experience. *United States v. Jackson,* 138 U.S.App.D.C. 143, 425 F.2d 574 (1970).

5. *Did the Court err in permitting the attorney for the Government to refer to the United States of America as his "client"?*

During his closing argument, the Assistant United States Attorney referred to the United States of America as his "client". Defendant contends that by this comment the United States Attorney was telling the jury that he was the attorney for their Government and that this comment was prejudicial.

In assessing claims of prosecutorial misconduct due to allegedly prejudical remarks, we must first determine whether the defendant was prejudiced by the characterizations. *United States v. Somers,* 496 F.2d 723, 738 (3d Cir. 1974). As the Third Circuit stated in *United States v. Leftwich,* 461 F.2d 586, 590 (3d Cir. 1972):

[I]mproprieties of argument by counsel to the jury do not call for a new trial unless they are so gross as probably to prejudice the defendant and the prejudice has not been neutralized by the trial judge before submission of the case to the jury.

The Court is not aware, and the defendant has not disclosed to the Court, the precise manner in which the statement was prejudicial. Indeed, we do not feel that in the context in which the remark was made, at the beginning of his closing argument, that the prosecutor's remark that the United States of America was his "client" was improper.

Even if we were to determine that the remark was improper, viewed in the context of this lengthy two week trial, considering the ambiguous nature of the remark, and in light of the fact that the evidence adduced at trial was more than sufficient to convict the defendant, we conclude that the remark was not in any way prejudicial to the defendant and certainly does not warrant the granting of a new trial. See *United States v. Somers*, 496 F.2d 723 (3d Cir. 1974); *United States v. Richard Dabney, et al.*, 393 F.Supp. 529 (E.D.Pa.1975) (Fogel, J.).

Motion denied.