**UNITED STATES of America, Appellee,**

v.

**Michael MEDICO, Appellant.**

**No. 807, Docket 76–1426.**

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1977.

Decided May 25, 1977.

Paul Windels, Jr., New York City (Windels & Marx, J. Dennis McGrath, New York City of counsel), for appellant.

Lee Alan Adlerstein, Asst. U. S. Atty., Brooklyn, N.Y. (David G. Trager, U. S. Atty., E. D., Bernard J. Fried, Asst. U. S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before MANSFIELD and VAN GRAAF-EILAND, Circuit Judges, and CARTER, District Judge.*

ROBERT L. CARTER, District Judge:

On May 27, 1976, there was an armed robbery of the Chemical Bank at 23–98 Bell Boulevard, Queens, New York by two masked men. While one of the men held a shotgun to the assistant bank manager, the other came into the tellers' area, and took almost $23,000 in cash from the tellers' drawers. The two then left the bank. Rosario Frisina, the branch manager, and Barbara Balzarini, a teller, were in the tellers' area. Appellant was indicted and convicted for the crime. He appeals on the grounds that errors at a pre-trial suppression hearing and errors at trial warrant reversal.

*Claimed Pre-Trial Errors*

On June 2, 1976, at separate interviews, F.B.I. agent David Carman showed Frisina, Balzarini and Louis Castabile, another bank employee, a group of eight photographs of white males, one of which was that of the appellant. Each selected appellant's photograph as that of one of the bank robbers.

Shortly thereafter, on June 2, appellant was apprehended, and on the same day, F.B.I. agents picked up Maria Medico, appellant's wife. They went with her to her apartment, searched the apartment and took from it unused cartridges, spent cartridges dug out of the furniture and walls of the apartment, and a pair of red pants riddled with bullet holes.

On June 24, 1976, Judge Weinstein held a pre-trial suppression hearing to determine whether the procedures employed by agent Carman in displaying the photographs to Frisina, Balzarini and Castabile were unduly suggestive and whether the Medico apartment had been entered and searched with Mrs. Medico's consent. He found no basis for invalidating the photographic display to the bank employees, nor for suppressing the evidence seized at the apartment. We agree with the trial court.

*Discussion*

█ The photographic display issue can be disposed of summarily. Agent Carman testified that he showed the bank employees eight photographs at separate interviews, but did not indicate that one of the photographs was that of one of the bank robbers. He asked each employee to look at the photographs to determine whether they recognized anyone as being the individual who participated in the robbery. The photographs were handed to each employee in a group. They went through them and picked out Medico's photograph. The procedure followed was clearly proper. *Simmons v. United States*, 390 U.S. 377, 383–384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968);

* Of the United States District Court for the Southern District of New York, sitting by designation.

see also *Kirby v. Illinois*, 406 U.S. 682, 691, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

We also agree with Judge Weinstein that the prosecution met its burden of proving that Mrs. Medico had "freely and voluntarily given" her consent to the F.B.I. agents to enter and search her apartment. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). A search pursuant to a valid consent is constitutionally permissible, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and the totality of all the circumstances, *id.* at 227, 93 S.Ct. 2041, leaves no doubt that consent was freely given. Mrs. Medico testified that the F.B.I. agents were neither threatening nor menacing in eliciting her consent (Tr. 46, 51),[1] and that she had read the consent form before signing it (Tr. 48). Appellant argues that Mrs. Medico was never informed that she had a constitutional right to refuse the F.B.I. agents permission to enter and search her apartment, but "knowledge of a right to refuse is not a prerequisite of a voluntary consent," *ibid.*, although it is one of the factors to be considered, *ibid.* No argument is made that Mrs. Medico was unauthorized to permit a search of the apartment she and appellant shared.

Appellant contends that the totality of the circumstances

> "reveals strong evidence of implicit psychological coercion upon Mrs. Medico. Under the power of drugs, with an hysterical daughter, her husband just arrested by F.B.I., cut off from consulting with her friend, . . . with perhaps as many as ten agents in her apartment, with threats being made about the fact that 'we don't want to take a mother from her child,' it was not surprising that

1. All references to the transcript in this section denote the pre-trial hearing held on June 24, 1976. References to the transcript in the following section denote the actual trial held on June 28, 1976.

2. While Mrs. Medico was under considerable pressure, it would be unfair to say that she was subjected to "psychological coercion" by the F.B.I. agents within the meaning of the cases dealing with voluntary consent.

Maria Medico would have succumbed. . . ."

Brief of Defendant-Appellant at 28. In determining whether acquiescence was voluntary, "account must be taken of . . . the possibly vulnerable subjective state of the person who consents." *Schneckloth v. Bustamonte, supra*, 412 U.S. at 229, 93 S.Ct. at 2049. Mrs. Medico was undoubtedly psychologically vulnerable[2] when she agreed to the search, but the record discloses no evidence that the F.B.I. agents took advantage of this weakness by the use of subtle or overt pressure to secure her cooperation. A large number of agents in her apartment could have proved unsettling, but, as already noted, Mrs. Medico testified that they were neither threatening nor menacing.

We also find it difficult to read the statement made by one of the agents that "we don't want to take a mother from her child" as an implied threat as appellant urges us to do, in light of the fact that it was immediately preceded by the statement, "we are not here to arrest any woman with a child" (Tr. 48). Nor did Mrs. Medico indicate that she thought the agent meant the challenged statement as a threat.[3]

Mrs. Medico also testified that on the day in question she had used "pot, cocaine, heroin, methadone" (Tr. 50). The suggestion that drugs impaired her faculties and therefore made her incapable of voluntarily consenting is controverted by her clear recollection of the incidents that took place and her description of her own thought processes. Moreover, this testimony is frankly incredible. It's reliability is made more questionable because it differs somewhat from her earlier testimony:

3. This situation is therefore distinguishable from *United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975) in which police told the defendant that they "would not arrest his girlfriend," *id.* at 559, if he consented to the search. In *Bolin*, consent given in response to such an implied threat was considered not voluntary.

"Q. Were you using drugs at this time, Mrs. Medico?

A. Yes.

Q. What sort of drugs were you on?

A. Well, on the program, methadone. I started using—I was smoking—heroin—I mean smoking pot."

(Tr. 49). Under the circumstances, Judge Weinstein, who had an opportunity, which we do not, to observe Mrs. Medico's demeanor and assess her behavior on the stand, would have been justified in substantially discounting or completely disregarding this aspect of her story.

For these reasons, we agree with the trial court that Mrs. Medico's consent was freely and voluntarily given.

*Claimed Errors at The Trial*

F.B.I. agent Raymond Bernard identified a pair of red pants which he had taken from the Medico apartment on June 2. The pants contained numerous holes in them which the agent testified appeared to be "pellet holes possibly from a shotgun" (Tr. 80). He also identified a 32 calibre shell, a 22 calibre shell and a Smith 22 calibre shell as objects taken from the Medico apartment during the agents' search (Tr. 80–81). F.B.I. agent Jerry Loar identified three lead fragments which he testified had been removed from the wall of the back bedroom of the Medico apartment and that two of the fragments appeared "to be either 22 or 25 calibre slugs fired from a 22 calibre pistol" (Tr. 84). He testified that there were holes in the bedroom wall of the apartment caused by shots being fired at the wall (Tr. 85). Appellant argues that such evidence was highly prejudicial and of no probative value in respect of the charges in the indictment. Therefore, it is urged, its admission constituted reversible error.

William Carmody, a bank employee, testified that about five minutes after the robbers had fled with the bank funds and while he was locking the entrance door, a bank customer knocked on the door. Carmody had seen this customer monthly at the bank for the past five years (Tr. 92), but he did not know his name (Tr. 91) and had not seen him since the robbery (Tr. 92). A young man about 20 years old whom Carmody did not know was sitting outside in a car giving the customer the make and license plate number of the getaway car. The customer relayed the information through the door to Carmody who took it down on his check book. Carmody could not hear what the young man was saying to the customer (Tr. 94), although he could see the youth's lips move as the customer was telling him what was being said. Carmody took down the description of the getaway car as a "tan Dodge Valiant" with license plate number "700 CQA" (Tr. 92). Judge Weinstein allowed the testimony in under Rule 804(b)(5), Fed.R.Ev. The judge offered appellant a five day adjournment to meet the testimony or make his own investigation (Tr. 96). Appellant declined the invitation asserting that the government had indicated that it had made serious attempts to locate the two witnesses without success. *Ibid.* On admitting the testimony the district judge advised the jury that it was hearsay, that since the two witnesses were not present, the statement was not subject to cross examination; that the probative value of the statement was for the jury to determine, bearing in mind that the two missing witnesses were not subject to cross examination and their testimony was not under oath (Tr. 95).

William Cariola testified that he used to work with Medico for a taxicab company and would see Medico driving an off-white Dodge with license plate number 700 CQA (Tr. 101). He denied ownership of a car bearing license plate number 700 CQA. At the side bar the government advised the court that according to Cariola he had lost and then recovered his wallet. The wallet contained all his identification. When he regained possession of his wallet, it contained a registration certificate for a car with license plate number 700 CQA, registered in Cariola's name by a third party (Tr. 102–3) whom Cariola believed to be Medico. The government wanted to question Cariola about the matter before the jury. Appellant's counsel demurred saying "I think we

**314**

ought to leave that out." The court agreed (Tr. 103) and the government rested. It is claimed that admission of this double hearsay testimony also constituted reversible error.

*Determination*

■ The admission of the hearsay statements of the bystanders concerning the getaway car raises at first blush serious problems.[4] Those difficulties become even more acute if the hearsay issue is not kept separate and apart from the refusal of the district court to allow the government to question Cariola more closely about the Dodge with license plate 700 CQA being registered in Cariola's name.

The testimony was admitted under the overall residual hearsay exception as provided in Rule 804(b)(5), Fed.R.Ev., which reads:

"(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general pur-

poses of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

This court has not yet had occasion to define the proper scope of Rule 804(b)(5) in a criminal trial. However, in *United States v. Iaconetti,* 540 F.2d 574 (2d Cir. 1976), in upholding the admission of hearsay statements in reliance on Rule 803(24), a residual hearsay exception identical to 804(b)(5), this court found the "statements in question possessed sufficient indicia of reliability, and were the best evidence to corroborate" the account of one of the government's witnesses as to what took place. It was also pointed out that "the statements were relevant to a material proposition of fact," *id.* at 578.

The proposed new Federal Rules of Evidence, as prescribed by the Supreme Court and transmitted to Congress contained identical provisions in Rules 803 and 804 authorizing federal courts to admit any hearsay statement not covered by stated exceptions. The Advisory Committee Note advises that these residual hearsay exceptions were included in the proposed rules

---

4. We would have little difficulty in upholding Judge Weinstein's ruling as a proper exercise of discretion had this been a civil case. We are faced here, however, with the Sixth Amendment's mandate that in "all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This has created some confusion as to whether the reach of the hearsay rules and the confrontation clause are coterminous. *See* Younger, *Confrontation and Hearsay: A Look Backward, A Peek Forward,* 1 Hofstra L.Rev. 32 (1973); Note, *Confrontation and the Hearsay Rule,* 75 Yale L.J. 1434 (1966). The Supreme Court, however, has made clear that while the hearsay rule and the confrontation clause "stem from the same roots," *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.2d

213 (1970) and "are generally designed to protect similar values," *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970), their reach is not coextensive. *See, also Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Sixth Amendment guarantee of confrontation, therefore, should not blind us to the reality that the question of the admission of the hearsay statements, whether in a criminal or civil case, turns on due process considerations of fairness, reliability and trustworthiness. Experience has taught that the stated exceptions now codified in the Federal Rules of Evidence meet these conditions.

because it would be "presumptuous to assume that all possible desirable exceptions to the hearsay rule have been catalogued; . . ." and that the unfettered exercise of judicial discretion was not contemplated, but the residual hearsay exception in Rules 803 and 804 would permit the courts to deal with new and presently unanticipated situations which demonstrate a trustworthiness within the spirit of the specifically stated exceptions. The residual exceptions as proposed, however, were rejected by the House Committee on the Judiciary because it was felt that the two provisions injected "too much uncertainty in the law of evidence and [might impair] the ability of practitioners to prepare for trial." H. Rep. No. 650, 93rd Cong., 1st Sess. 5–6, U.S. Code Cong. & Admin. News 1974, p. 7079.

The Senate Judiciary Committee, on the other hand, feared that without a residual hearsay exception "the specifically enumerated exceptions could become tortured beyond any reasonable circumstances which they were intended to include . . ." S. Rep. No. 1277, 93rd Cong., 2d Sess. 19, U.S. Code Cong. & Admin. News 1974, p. 7065. Accordingly the committee adopted Rules 803(24) and 804(b)(5) in their present form. The committee report indicates that the provisions are not intended as "a broad license" to trial judges to admit hearsay but for use under rare and exceptional circumstances with the trial judge being admonished to "exercise no less care, reflection and caution than the courts did under the common law in establishing the now-recognized exceptions to the hearsay rule." *Id.,* at 20, U.S. Code Cong. & Admin. News 1974, p. 7066. The Senate proposals were accepted by the Conference and enacted into law in their present form.

Rule 804 deals, among others, with situations in which the proponent of a witness' statement has sought by process or other means to procure the attendance of the witness at the trial to testify in person. This situation was present here. Defense counsel readily conceded that the government had made serious efforts to locate the two witnesses so that they could testify in person.

Indeed the testimony meets all the specific requirements for admission as a present sense impression under Rule 803(1)[5] under which a hearsay statement will not be excluded even though the declarant is available. As the Advisory Committee Note to Rule 803(1) indicates, the theory for this exception is that the "contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Precise contemporaneity is not required, thus a "slight lapse is allowable." *Ibid.* The Committee Advisory Note points out that the cases reveal a hesitancy to admit the statement without more when the bystander's identity is unknown. *Ibid.* This may well be the reason Judge Weinstein decided to rely on Rule 804(b)(5). That fact, however, that the statement meets all the specific standards for admissions under 803(1) but fails to meet all the criteria set forth in the supportive judicial rationale surely brings it within the grant of discretion which 804(b)(5) accords to a trial judge, consonant with the legislative purposes which the residual exception was designed to achieve.

Moreover, several factors contribute to the reliability of Carmody's testimony. The two unavailable witnesses were at the scene of the crime. One was in position to perceive and describe the car and license plate number the robbers used to effect their escape; and while the other did not claim to have himself observed the car or the license plate, he relayed to Carmody that *information just told to him by the first bystander* who personally had seen the robbers drive away in the getaway car. The time frame in which the *information was passed from the eyewitness to the bank customer* and

---

**5.** Rule 803(1) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

then from the customer to Carmody was very brief and followed the actual getaway so closely, that the likelihood of inaccuracies is small and the possibility that truth was undercut by speculation or fabrication reduced. The probability that the information was accurate is enhanced by the fact that Carmody transcribed it onto his checkbook as it was being told to him.

■ Carmody's testimony was highly relevant, clearly material, and the need for that evidence was great.[6] No other evidence providing the same information or being more probative of the fact for which the statement was offered was available to the government. It would have been preferable, certainly, to have had the youth and/or the bank customer testify. However, the government made serious efforts to locate these witnesses to no avail, and the defense was offered an adjournment to prepare to meet this evidence or make investigations of its own. The offer was declined[7] (Tr. 96). In light of these circumstances, the admission of Carmody's testimony was proper under Rule 804(b)(5). Clearly the trustworthiness and necessity for the admission of the statement and the specific facts and circumstances warranting allowing the testimony to come before the jury are on par with those which justify the enumerated exceptions.

What in fact makes the admission of Carmody's testimony problematic is not the likelihood of its unreliability or untrustworthiness but the testimony of William Cariola linking Medico to the getaway car described in Carmody's testimony. Cariola testified that for about two months he and Medico were employed by the same taxicab company and that he had seen Medico driving "an off-white 1965 Dodge, license plate 700 CQA" (Tr. 98).

While it strains credulity that a person could remember the exact number of his co-worker's license plate, when he apparently had known his co-worker only casually and had seen him regularly over a short span of time, that is an issue of credibility for the jury. A crucial fact affecting Cariola's credibility was never told to the jury, however—the fact that the Dodge, license plate 700 CQA, which Cariola, under oath, denied he owned, was in fact registered to him. At a sidebar conference, the U.S. Attorney revealed the highly unusual story that

> "Cariola had lost his identification, wallet, and subsequently it was found, and he said that there was in the car in the wallet information, identification for a car that had been registered, not by him but by another individual, and that was

---

**6.** In *United States v. Yates,* 173 U.S.App.D.C. 308, 524 F.2d 1282 (1975) the court held that the confrontation clause would bar the admission of hearsay testimony, even if the requirements of Rules 803(24) or 804(b)(5) are satisfied, where none of the three conditions set forth in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), are met:

> "(1) there are 'indicia of reliability' surrounding the evidence; (2) the evidence is 'peripheral' rather than 'crucial' or 'devastating'; and (3) the witness is equally available to the prosecution and the defense."

*United States v. Yates, supra,* 524 F.2d at 1285–86. It conceded that "the precise contours of these three requirements are not free from doubt, nor is it certain whether all three must be satisfied in every case." *Id.* at 1286 (footnote omitted).

To the extent that its conclusion may differ from ours, we do not follow it. We do not agree that the *Dutton* standard that hearsay evidence not be "crucial" or "devastating" is applicable to the residual hearsay exception set forth in Rules 803(24) and 804(b)(5), Fed.R.Ev. *Dutton* was decided before the new federal rules were enacted. The *Yates* requirement would run counter to the express language of the two rules which require such evidence to be of a material fact. Moreover, subsequent to *Dutton* the rules as proposed by the Supreme Court itself had a broader residual hearsay exception than was finally enacted and made no reference to the matter being peripheral. A better analysis, we suggest, would require the exclusion of hearsay evidence which is "crucial" or "devastating" only where the unavailability of the declarant deprives the trier of fact of a satisfactory basis for evaluating the truth of the extrajudicial declaration. *See United States v. Wolk,* 398 F.Supp. 405, 410 (E.D.Pa. 1975).

**7.** The rule requires prior notice to the adverse party, but this omission was cured by the court's offer to grant the defense a five-day adjournment.

given over to the State Department of Motor Vehicles."

(Tr. 103).

■ The government asked to bring out this information but defense counsel stated, "I think we ought to leave that out" (Tr. 103). The court agreed. We recognize that the hindsight nuances which make us believe the testimony should have been allowed may not have been as evident at trial. It certainly was not evident to defense counsel. Both he and the court were concerned that pursuit of Cariola's testimony might lead to matters far removed from the issues at hand. We think, however, that the jury should have had this information to evaluate Cariola's credibility. Because the defense acquiesced in the trial court's decision to exclude these facts, however, we cannot now find that decision constituted plain error.

■ Turning to appellant's claim of error with respect to the red pants, we note initially that appellant failed to object to the admission of this evidence at trial on the ground that it was prejudicial and of no probative value.[8] Under *United States v. Indiviglio*, 352 F.2d 276 (2d Cir. 1965), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), therefore, review of the asserted error on this ground is foreclosed absent "plain error."

■ If this evidence had been introduced only to imply that the appellant's character was bad or that he had a propensity to behave violently, its admission would have constituted error. *United States v. Ravich*, 421 F.2d 1196, 1204 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970); *Walker v. United States*, 490 F.2d 683, 685–85 (8th Cir. 1974). However, if the evidence were introduced to identify the appellant as one of the robbers, it would have been relevant under Rule 401, Fed.R. Ev.,[9] and therefore admissible under Rule 402,[10] to establish opportunity or preparation to commit the crime charged. *United States v. Robinson*, 544 F.2d 611, 615 (2d Cir. 1976); *United States v. Ravich, supra*, 421 F.2d at 1204.

■ Rule 403 [11] directs the trial judge to weigh the probative value of such evidence against its prejudicial effect on the jury in order to determine whether even though relevant, such evidence should be excluded. This balancing is "a matter generally left within the wide, and wise, discretion of the trial court." *United States v. Robinson, supra*, at 616; *United States v. Harvey*, 526 F.2d 529, 536 (2d Cir. 1975); *cert. denied*, 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976); *United States v. Montalvo*, 271 F.2d 922, 927 (2d Cir. 1959), *cert. denied*, 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960).

The probative value of the trousers and the pellets in identifying the appellant as one of the bank robbers rested on the jury's drawing two inferences [12] from this evi-

---

**8.** Appellant did not raise the issue of prejudicial effect at trial. He did object to the evidence on the grounds that Mrs. Medico had not given her consent. The trial court found no basis for this claim, and, as our opinion indicates, nor do we.

**9.** Rule 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**10.** Rule 402 provides:

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory au-

thority. Evidence which is not relevant is not admissible."

**11.** Rule 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**12.** This court has rejected "as untenable the often urged claim that an inference may not be grounded on an inference," *United States v. Ravich, supra*, 421 F.2d at 1204 n.10, although it also recognized that

"[t]he length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may

dence. The first inference involved the appellant's possession of the weapons used to discharge the pellets into the wall and trousers at the time of the robbery. The second inference would have been that one or more of these weapons was used in the robbery, *United States v. Robinson, supra,* at 616–618.

One bank employee testified that one of the robbers carried a rifle and the other carried a shotgun (Tr. 13). Another employee testified that one of the robbers had "a long gun" (Tr. 44). There was, concededly, no evidence linking the shotgun used in the robbery to the shotgun fired in Medico's apartment. Absent additional factors, this court has indicated that the mere similarity of the weapons would be an insufficient ground for admission, *United States v. Robinson, supra* at 618 n.10. The inferences required to be drawn by the jury—that at the time of the crime, appellant had access to weapons, at least one of which was used in the robbery—without more would be too weak. *Id.* at 616, 617.

Where, however, direct and circumstantial evidence independent of the defendant's possession of guns [13] exists to link him to the crime, the basis for those inferences is strengthened, *id.* at 617, and admission of such evidence becomes less questionable. Two eyewitnesses to the crime identified Medico in court as one of the perpetrators. Frisina testified that appellant stopped near him on leaving the tellers' area with $23,000 in cash and that his eyes, moustache, ears and part of his face were visible. Frisina wears glasses and did not have his glasses on when the robbery took place. He is nearsighted but can see clearly at short distances. Balzarini testified that she saw appellant's face from the tip of the nose to his chin before it was covered. Since the man also came in close proximity to her while taking money from the tellers' area, she testified that she was able to see his nose, eyebrows, moustache and hair through the mask and that his features were not distorted. Both had also positively identified appellant, as indicated ante, before trial as one of the robbers from an F.B.I. photographic spread.[14] It was stipulated that Castabile, another eyewitness to the crime, would have testified that Medico's picture "closely resembled" the individual he saw in the bank (Tr. 109–10). Finally, there was also testimony that before the robbery Medico had been seen driving the car used for the getaway.

■ The trial court, of course, would have been justified in excluding this evidence in light of its very prejudicial nature. However, as indicated earlier, this was a matter in which the trial judge has wide discretion, and under all the circumstances, particularly since no proper objection was made, we cannot say that he abused this discretion or committed plain and reversible error.

■ Appellant raises one additional claim: that his counsel at trial was so inadequate as to violate his Sixth Amendment rights. This claim has no merit. The record reveals that by any standard that might be applied, appellant's counsel at trial was constitutionally sufficient. *United States v. Wight,* 176 F.2d 376, 379 (2d Cir. 1949), *cert. denied,* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950).[15] Nothing in the record

therefore render it more susceptible to exclusion as . . . prejudicial . . ." *Ibid.*

**13.** Evidence that Medico had access to quantities of guns is inherently suspicious. *Compare United States v. Ravich, supra,* and *United States v. Robinson, supra,* at 617.

**14.** See discussion *infra,* Part III.

**15.** In *Rickenbacker v. Warden, Auburn Correctional Facility,* 550 F.2d 62 (2d Cir. 1976) and *United States v. Taylor,* No. 76–1210 (2d Cir.

April 13, 1977), the court held that it was unnecessary to reconsider the standard for inadequate counsel enunciated in *United States v. Wight, supra* at 379—that "a lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." This is again the situation facing the court. Even under the more liberal standards followed in other circuits, *see Rickenbacker, supra,* at 65 and *Taylor, supra,* at 2829–30, plaintiff's trial counsel was adequate.

would even arguably support a finding to the contrary.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent on the ground that the double hearsay identification of the getaway car admitted by the trial court lacked any guarantee of trustworthiness entitling it to admission under the residual hearsay exception, FRE 804(b)(5), relied upon by the majority. In the absence of any such guarantee or of an opportunity to test the reliability of the proof through cross-examination, the admission of this evidence in my view constituted an abuse of discretion and the error was not "harmless." *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). I would therefore reverse and remand for a new trial.

The sole issue in this trial was the identification of appellant as one of two robbers of a Chemical Bank branch in Queens, New York. On this issue the license plate number and description of the alleged getaway car was a critical element, which the government sought to prove through William Carmody, a bank employee. Carmody, however, did not see the car himself. He obtained the information from a man he recognized as a bank customer, but who was neither identified by name nor located for trial. Nor did the customer, according to Carmody, see the getaway car. He, in turn, had obtained the license number and description some five minutes after the robbery from a "young man" seated in a car outside the bank, who also could not be identified or located for the trial. Carmody testified that the young man relayed the license number and description to the customer who shouted through the closed bank door to Carmody, who wrote the information down on his checkbook. Carmody furnished the description after referring to the checkbook to refresh his recollection.

Serious problems are presented as to the trustworthiness of this hearsay, which indicate that it should not qualify as falling within any exception to the hearsay rule.[1] Since the license number and identification were obtained during the armed robbers' hurried flight from the scene of the crime, the young man in the car may well have erred due to excitement, poor eyesight, poor lighting conditions or visual obstructions. Indeed it is possible that the young man may have been sufficiently confused or frightened to have identified a car that was not the getaway vehicle at all. This type of eyewitness identification has long been considered

"peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967).

Yet, because the evidence was admitted from Carmody rather than from the out-of-court declarant himself, the defendant was deprived of the opportunity to cross-examine the declarant, which might have significantly reduced the reliability of the evidence in the eyes of the jury.

It is further evident that some of the same factors which might have interfered with the young man's direct identification of the vehicle might well have prevented the bank customer from correctly relaying the young man's description, including faulty hearing, background noise, excitement, and similar circumstances. Yet, because the bank customer was also unavailable to be cross-examined, the accuracy of his statement could not be tested.

The record in the present case reveals that fears of distortion in this crucial identification testimony are not unjustified. Carmody testified, for instance, that the getaway car was a "Brown Valiant," which would indicate a Plymouth. His checkbook, which was admitted into evidence, noted that the car was not Brown, but "tan," and

---

1. The foundation for all hearsay exceptions is circumstantial trustworthiness in the absence of cross-examination. See 5 Wigmore, Evidence §§ 1420–22 (Chadbourne rev. 1974); Advisory Committee Notes, *Introductory Note: The Hearsay Problem.*

was a "Dodge Valiant," a non-existent model. William Cariola, a corroborating witness, testified that the car driven to and from his job by Medico was an "off white Dodge." Thus significant errors in perception or communication found their way into the evidence, even without the presence of the out-of-court declarants for cross-examination.

The unreliability of the hearsay testimony identifying the getaway car was increased by the government's disclosure of a bizarre circumstance. The key witness relied upon by the government to link appellant to the getaway car was Cariola, appellant's former co-worker. Even though the two were only casual acquaintances, Cariola, in testimony which, according to the majority, "strains credulity," was able to remember the exact license number of the car which appellant had driven to work on occasion. This number turned out to be the same as that of the getaway car, as identified by Carmody's double hearsay testimony.[2] More important, in offering this testimony the government advised the trial judge in a side bar conference of the extraordinary fact that the automobile had actually been registered in the name of Cariola himself rather than that of appellant. Although appellant's counsel apparently failed to grasp and exploit the implications of this disclosure, it raises a serious question, particularly in view of Cariola's criminal record, as to whether the failure of the young man or the bank customer (who had been seen frequently at the bank before the robbery but not thereafter) to come forward and testify may not have been attributable to efforts by the conspirators or others to protect against full disclosure of the robbers' identity. Since neither the young

man nor the bank customer was produced for cross-examination, their motives, biases and possible connections with appellant or Cariola could not be explored. Neither, therefore, could be compelled to "stand face to face with the jury in order that they may look at him and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

It is to guard against just such possible consequences that the hearsay rule evolved, with exceptions for nonhearsay only where there are circumstantial guarantees of trustworthiness in lieu of cross-examination. In my view it was a serious error for the trial judge to resort to the residual hearsay exception found in FRE 804(b)(5) as the basis for admitting the double hearsay in the present case.[3] The effect is to emasculate the hearsay rule and violate the fundamental purposes underlying it. In formulating the residual exception, the drafters of the Federal Rules of Evidence cautioned that it should be used sparingly:

> "It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b)." S.Rep.No. 1277, 93d Cong., 2d Sess. 18–20 (1974), U. S. Code Cong. & Admin. News 1974, p. 7066.

The admission of the double-hearsay identification of the getaway car in the present case violated both the spirit and purpose of FRE 804(b)(5) as thus expressed, since the evidence failed to satisfy any of the basic conditions for exceptions to the

---

**2.** By separately resolving the issues raised by Cariola's connection with the alleged getaway vehicle and the admission of Carmody's testimony, the majority conveniently ignores the serious effect of the revelations concerning Cariola on the probative value and trustworthiness of the identification testimony.

**3.** At best, the majority's conclusion that Carmody's testimony would be admissible under the exception for present sense impressions,

FRE 803(1), would only cover the first stage of the double hearsay, the statement from the "young man" to the bank customer, because only the "young man" was perceiving the startling event he was describing, i.e., the getaway of the robbers. Moreover, it is difficult to conclude that the license number and description of the vehicle would be a description or explanation of the "event," within the meaning and common usage of FRE 803(1).

hearsay rule. It lacked any circumstantial guarantee of trustworthiness, it was hardly "more probative on the point for which it is offered than any other evidence which the proponent can procure," and its admission did not serve "the interests of justice." Not only was there danger of serious error in perception on the part of the young man and the bank customer but Cariola's testimony purporting to provide the essential link to the appellant was far from being free of doubt and suspicion. As the Supreme Court said in *Wade, supra,* a criminal defendant's "most basic right" is that of a "fair trial at which the witnesses against him might be meaningfully cross-examined." 388 U.S. at 224, 87 S.Ct. at 1930.

"For two centuries past, the policy of the Anglo-American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by general exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience. . . . [I]t is beyond doubt the greatest legal engine for the discovery of truth." 5 Wigmore on Evidence § 1367.

No authority supports the application of the 804(b)(5) residual hearsay exception in a case like the present one when serious questions of reliability have been raised in the absence of cross-examination. On the contrary, one circuit has refused to apply the exception because it poses serious constitutional problems. *United States v. Yates,* 173 U.S.App.D.C. 308, 524 F.2d 1282 (1975).

The cases relied on by the majority are readily distinguishable. In *United States v. Iaconetti,* 540 F.2d 574 (2d Cir. 1976), we found support in the residual hearsay exception for admission of rebuttal testimony

by two witnesses (Stern and Goodman) as to statements of a previous witness (Lioi) regarding the defendant Iaconetti's request for money. But the significant difference is that there the declarants (Stern, Goodman, Lioi, and Iaconetti) were all available for cross-examination and the jury was allowed to resolve a conflict in credibility among witnesses who were present and whose demeanor could be judged. In admitting statements similar to those in *Iaconetti,* it has often been stated that where the declarant is present and on the witness stand, present cross-examination provides a sufficient protection against unreliable out-of-court statements. *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *DiCarlo v. United States,* 6 F.2d 364, 368 (2d Cir.) (L. Hand, *J.*), *cert. denied,* 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925). No such protection was available in this case.

The availability of the out-of-court declarants for cross-examination at the trial was expressly relied upon in *United States v. Leslie,* 542 F.2d 285, 288 (5th Cir. 1976), the only other criminal case to uphold the introduction of testimony under the residual hearsay exceptions. There, FBI agents corroborated written statements by the defendants which were recorded by the agents and introduced at trial, after the defendants had taken the stand and denied the truth of those statements. Thus, in that case both the defendants and the agents, whose credibility had to be determined by the jury, were available and present at the trial.[4]

In the present case neither of the out-of-court declarants upon whose reliability and accuracy the identification of the getaway car was based was available, with the result that their credibility could not be tested by appellant. Moreover, not only were there indications that distortions had occurred in the substance of the visual identification,

---

4. In other cases which have applied the residual hearsay exceptions the reliability of the evidence admitted was not in question. *Muncie Aviation Corp. v. Party Doll Fleet,* 519 F.2d 1178, 1184 (5th Cir. 1974) (admitting national air safety codes and recommendations); *Ark-Mo Farms v. United States,* 530 F.2d 1384, 1386–87 (Ct.Cl.1976) (admitting Corps of Engineers' hydrological study).

but the linking evidence supplied by Cariola was so suspicious as to undermine the entire theory of the identification.

For these reasons I would reverse.