# UNITED STATES

### v.

### Jesus RAMIREZ.

### No. 95 CR 0589 (BDP).

United States District Court, S.D. New York.

Nov. 3, 1995.

Bennett Capers, Asst. U.S. Atty., White Plains, NY, for The U.S. Government.

Susanne Brody, Federal Defender's Office, White Plains, NY, for Defendant.

## ORDER

PARKER, District Judge.

On July 5, 1995, Defendant Jesus Ramirez was indicted on two counts of conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. § 846 and with importation of heroin into the United States in violation of 21 U.S.C. § 952(a), and 18 U.S.C. § 2. The case is presently before the Court on Ramirez's motion to suppress physical evidence seized pursuant to his arrest. On September 13, 14, 28 and October 3, 1995, the Court conducted an evidentiary hearing and subsequently considered written submissions from the parties.

## BACKGROUND

On June 22, 1995, Customs Agents and other local enforcement officers in New York learned that a controlled delivery of a package containing drugs ("the Package") would be dropped off at a Mail Boxes etc. in Mt. Kisco, New York. The officers had received information from the United States Customs Service in Miami, Florida ("the Miami Agents") that the Package, which came from Colombia, contained heroin hidden in steel gears. The Miami Agents removed the heroin but forwarded the Package to its delivery address to determine the identity of its recipient.

At approximately 2:30 P.M. on June 22, the Customs Agents and other officers parked close to the Mailboxes Etc. saw Ramirez drive up in a 1985 Dodge Omni and go into the Mailboxes Etc. Moments later, Ramirez exited the Mailboxes Etc. carrying the package, got back into his car and drove off. The officers followed Ramirez to a residence at 35 Rome Avenue, Bedford Hills, New York ("the Residence") where they met up with Special Agent Ellwanger ("Ellwanger") of the Internal Revenue Service, Special Agent McSweeney ("McSweeney"), a United States Customs Agent, and Special Agent

Greenan ("Greenan"), also a United States Customs Agent. Ramirez exited his car and went into the Residence. Within one minute, he returned, carrying a hammer, a screwdriver and a pair of electrical pliers. Ramirez went back into his car and apparently attempted to open the package with a screwdriver. The officers waited a moment or two before they arrested him. At some point between 3:50 and 4:00 P.M., Greenan, Ellwanger, McSweeney and Senior Westchester District Attorney Investigator Pat Storino [1] ("Storino") approached the car. Greenan, with his hand on his unholstered gun, told Ramirez to get out of the vehicle; Ellwanger told him to put his hands up. Greenan then took Ramirez out of the car and patted him down for a weapon while Ellwanger handcuffed him. Greenan then put Ramirez against his car where he and McSweeney searched him again; Greenan told Ramirez that he was under arrest. During this time, Ellwanger, McSweeney and Storino drew their guns until they felt that Ramirez was safely in handcuffs—approximately ten to thirty seconds. Greenan switched Ramirez's handcuffs from the original rear cuff position to a front cuff position and placed him in the back seat of his car. Ellwanger, who had been sitting in the car, told Ramirez why he was being arrested and advised him of his

Miranda rights. Ramirez stated that he wished to speak with an attorney. Ellwanger immediately ceased his questioning.

The agents soon learned that Ramirez maintained a room and paid rent to his sister, Isabel Cardozo ("Cardozo") at the residence. McSweeney then approached the house and spoke with Cardozo. While the facts surrounding the interaction between Cardozo and McSweeney (as well as the other officers) are the subject of some dispute [2], it is clear that Cardozo signed a consent to search form in which she authorized the agents to search her residence. [3]

At that point Special Agent McSweeney, concerned that Isabel Cardozo's consent was not valid, asked for and received permission from Case Agent Mike McKenna and his supervisor, Special Agent Edward Choo ("Choo") [4] to ask Ramirez for his consent to search the room. Agent Greenan then exited the car, and McSweeney in conformity with safety procedures handed his gun to Greenan and joined Ramirez who was, by this time, front-cuffed in the back seat. McSweeney, aware that Ramirez "was not talking," identified himself as a customs agent, re-read Ramirez his Miranda rights, told him that "he was under arrest for narcotics statutes" and

1. The record does not indicate the exact time that Investigator Storino appeared at the scene.

2. For example, Cardozo testified that four to five officers interrogated her for five to ten minutes with their guns drawn and without identifying themselves. This testimony was contradicted by McSweeney and Internal Revenue Service Special Agent Dave McGrath and by Cardozo's neighbor and defense witness Eliriam Mazo. Moreover, Cardozo initially testified that she spoke no english, whereas agents McSweeney and McGrath testified that she spoke to them in english, with her twelve year old son interpreting particular words for her when necessary. Additionally Cardozo testified that the consent form was read to her, Detective Ed Ames testified that he was present when her son translated the form for her.

3. The text of the consent to search form provides: I [Isabel Cardozo], having been requested to consent to a search of [our] residence located at [35 Rome Avenue Bedford Hills, New York] and having been duly advised of my constitutional rights to (1) refuse such consent, (2) to require that a search warrant be obtained prior to any search, (3) that if I do consent to a

search any evidence found as a result of such a search can and will be used against me in any civil or criminal proceedings, (4) that I may consult with an attorney of my choosing before or during the search, and (5) that I may withdraw my consent to search at any time prior to its conclusion.
After having been advised of my constitutional rights, we hereby knowingly, intelligently, voluntarily waive my above rights and consent to a search and authorize [Special Agent McSweeney, Special Agent McGrath, Special Agent Ellwanger, Special Agent McKenna, Special Agents of the U.S. Customs Service Department of the Treasury and Internal Revenue Service] to conduct a complete search of the above described Residence.
The consent form was signed both by Cardozo and her husband Hector Cardozo, who arrived at the Residence some time after the arrest. Special Agent McGrath and Detective Ed Ames also signed the form as witnesses.

4. The record does not disclose the exact time that McKenna and Choo arrived at the Residence, although Choo testified that he arrived shortly after Ramirez's arrest.

**590**

then asked Ramirez for his consent to search the room. According to McSweeney, Ramirez spent a minute reading the same consent to search form provided to Cardozo and then signed it.[5]

After completing the search, McGrath provided Ramirez with an inventory form listing the items seized from Ramirez's room during the search. The preface to the inventory form provided: "I, Jesus Ramirez, after being advised of my constitutional rights and having given consent to the search of my room at [the residence], hereby acknowledge the seizure of the following items." After reading the form, Ramirez initialled it.

### DISCUSSION

Ramirez argues that the items seized from his room should be suppressed because the search violated his Fourth Amendment right to be free from unreasonable searches and seizures.[6] It is well established Fourth Amendment law that an individual has a right to be free from unreasonable search and seizures, and that "a search conducted without a warrant issued upon probable cause is 'per se unreasonable ... subject only to a few specifically established and well delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth*, 412 U.S. at 219, 93 S.Ct. at 2043–44.

In this case Ramirez argues that his consent was not voluntary.[7] He relies on the undisputed fact that he had been arrested at gunpoint by several agents, detained in a car, and handcuffed just minutes before he signed the form and had invoked his right to remain silent before consenting to the search.

The question of whether a consent is valid is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047–48. The Second Circuit has instructed that the factors to be considered in determining voluntariness should include, among other things, the possible vulnerable mental state of the consenting party, the details of the investigation, and the individual's intelligence and experience. See *United States v. Medico*, 557 F.2d 309 (2d Cir.1977), *cert. denied* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977); *United States v. Price*, 599 F.2d 494 (2d Cir.1979). The government need not show, to prove consent, that the subject knew he had a right to decline the request for a search. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598; *Schneckloth*, 412 U.S. at 234, 93 S.Ct. at 2051; *United States v. Crespo*, 834 F.2d 267, 271 (1987).

The record reveals no evidence of physical or mental coercion. Additionally, coercion sufficient to taint an otherwise valid consent is not inherent in the fact of arrest. *United States v. Kon Yu–Leung*, 910 F.2d 33 (2d Cir.1989) (citing *United States v. Valencia*, 645 F.2d 1158, 1165 (2d Cir.1980)) (citing *United States v. Watson*, 423 U.S. 411, 424,

**5.** We note that unlike the Cardozo's consent form which authorized the Agents to search the entire residence, Ramirez's consent form authorized the Agents to search only his room.

**6.** Ramirez also suggests that the government's request for consent violated his right to counsel. However, the sixth amendment right to counsel attaches only when adversary judicial proceedings have been initiated against the defendant. An adversary proceeding can be initiated by a formal charge, preliminary hearing, indictment, information or arraignment. After defendant's sixth amendment right to counsel attaches he has the right to the advice of counsel at "critical stages" of the proceeding, defined as "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate

from the accused's right to a fair trial." *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1975); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Because in the present case, a judicial proceeding had not been initiated against Ramirez, no right to counsel had yet attached. Even if the proceeding had been initiated by a formal charge, preliminary hearing, indictment, information, or arraignment, the request for consent to search is not a critical stage in the proceeding. See *United States v. Kon Yu–Leung*, 910 F.2d 33 (2d Cir.1990).

**7.** Because we find that Ramirez's consent was legitimate, we do not reach his contention that third party consent obtained from Hector and Isabel Cardozo was not valid.

96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976)). Moreover, facts adduced at the hearing indicate that the arrest was carried out rather quickly and with no violence. The officers who had initially drawn their guns during the arrest had reholstered them within thirty seconds. There is no indication that physical force was used to restrain Ramirez; his detention lasted only a short period of time; and he had not been threatened by the agents.[8] The fact that Ramirez was handcuffed does not warrant a finding of coercion. See *Kon Yu–Leung,* 910 F.2d at 41.

By the time Ramirez was given the consent form, the officers had identified themselves and had read him his Miranda rights. Ellwanger, the only Agent in the car, had removed his weapon; Ramirez himself was front-cuffed. Further, Ramirez told Ellwanger that he knew he could refuse to comply with the Agents' requests. Minutes before, when Ramirez was read his Miranda rights, he asked to speak with an attorney. Moreover, when he was readvised of his Miranda rights, he said that he understood each one of them. See *Kon Yu–Leung,* 910 F.2d at 41 (asking to speak with an attorney is a factor tending against a finding of involuntariness). Finally, the fact that Ramirez spent a minute reading the consent to search form before he told the officers that they could search his room suggests that he was aware of his rights and that his consent was voluntary.[9]

### III. CONCLUSION

For the foregoing reasons, Ramirez's motion to suppress is denied.

**SO ORDERED.**

---

**8.** Ramirez argues that McSweeney's comments that he was facing two mandatory five year sentences and that it was in his best interest to cooperate weighs against a finding of voluntariness. This argument is without merit, however, because these representations were made after the consent form was signed.

**9.** Finally, Ramirez argues that the search was not lawful because the Officers exceeded the parameters of the scope of his consent. See *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991) ("standard for measuring scope of search ... is what would the typical reasonable person have understood by the exchange between the officer and the suspect"). Ramirez argues that the seizure of property was unlawful because he only gave permission to search drugs. The testimony at the hearing, however, and the consent form clearly indicate that the Agents requested Ramirez's consent to search his entire room. See n. 5, *supra.* There was no testimony that the Agents searched any areas in addition to Ramirez's room.