The UNITED STATES of America

v.

**Michael G. THEVIS, Global Industries, Inc., William Ross Mahar, Anna Jeanette Evans and Alton Bart Hood.**

**Crim. A. No. 78–180A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 8, 1979.

William L. Harper, U. S. Atty., Dorothy Y. Kirkley, Craig A. Gillen, Asst. U. S. Attys., Atlanta, Ga., for plaintiff.

Bobby Lee Cook, Cook & Palmour, Summerville, Ga., for Thevis.

Edward T.M. Garland, Garland, Nuckolls & Kadish, Atlanta, Ga., for Global and Fidelity.

Austin E. Catts, Atlanta, Ga., for Evans.

Wm. Ralph Hill, Jr., Lafayette, Ga., for Hood.

## ORDER

HAROLD L. MURPHY, District Judge.

Pursuant to the bench rulings of the Court, this order will set forth in detail the factual findings and legal analysis relied upon by the Court in admitting or denying the proffered testimony of Roger D. Underhill under Rule 804(b)(5), F.R.E.

Counts I and II set forth substantive and conspiracy violations of 18 U.S.C. § 1962 (Racketeer Influenced and Corrupt Organizations Act, "RICO"). Among the predicate acts set forth in the pattern of racketeering activity are: (1) the murder of Kenneth "Jap" Hanna on November 13, 1970; (2) the extortion of Joseph Anthony in March, 1971; (3) the arson of a competitor on September 18, 1972 in Fayetteville, North Carolina; (4) the fraudulent use of

the mails in June, 1973; and (5) the murder of Jimmy Mayes on September 18, 1973. The government has offered the testimony of Roger Underhill contained in his grand jury testimony and F.B.I. "302" interviews as to each of those predicate acts. The testimony was offered against each of the defendants as to Counts I and II: Michael George Thevis, Global Industries, Inc., and Fidelity Equipment Leasing Company, Inc.

Roger D. Underhill is unavailable as a result of his murder on October 25, 1978. In Count X, defendants Thevis and Fidelity along with other coconspirators are charged with violating Underhill's civil rights by murdering him to prevent his testimony in this case. *See*, 18 U.S.C. § 241; *United States v. King*, 587 F.2d 209 (5th Cir. 1979); *United States v. Guillette*, 547 F.2d 743 (2d Cir. 1976), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977).

In ruling on the admissibility of the proffered testimony, the Court has been called upon to resolve serious issues involving both evidentiary and constitutional dimensions. Procedurally, the government tried Count X first; after putting its evidence before the Court and jury as to that charge, it then proceeded to try the two RICO counts. Chronologically, the first predicate act was the murder of Kenneth "Jap" Hanna on November 13, 1970. Prior to the tender of the Underhill statements under Rule 804(b)(5), the government presented its evidence as to the Hanna murder in the presence of the jury. The case was then recessed for hearings outside the presence of the jury. In these hearings, which took three days, the defense presented evidence as to credibility, motive, interest, and bias of Underhill as well as evidence directed towards controverting the corroborating evidence which the government relied upon to reach the "circumstantial guarantees of trustworthiness" required by Rule 804(b)(5).

Since the proffered testimony also raised the right to confrontation guaranteed by the Sixth Amendment, the Court gave the defendants an opportunity to present *in camera* their defense to Count X. The defendants accepted that offer, and the defense showing was considered prior to the ruling on the admissibility of the proffered testimony of Underhill under Rule 804(b)(5). The Underhill statements as to the Hanna murder were then admitted into evidence.

As to the Underhill proffer on each of the other predicate acts, the procedure for reviewing the corroborating evidence was repeated and the general showing made as to Underhill's interest, credibility, bias, and motive was incorporated.

Preliminary questions of admissibility are addressed to the Court under Rule 104(a), and the proffered statements of Underhill under the aegis of Rule 804(b)(5) present three preliminary questions to the Court:

(1) does each proffered statement satisfy the requirements of Rule 804(b)(5)?

(2) does the admission of the proffered statement violate the right to confrontation guaranteed by the Sixth Amendment?

(3) if the admissibility of the proffered statement raises a confrontation issue, has the defendant waived his right to confrontation?

The Court will analyze each proffered statement as to the first preliminary question before addressing the second and third issues in a manner applicable to all proffered statements which satisfy Rule 804(b)(5).[1]

### I

Rule 804(b)(5)[2] is the residual exception for application when the declarant is una-

---

1. The Court is aware that Rule 804(b)(5)'s requirement that admission of the statement be in "the interests of justice" necessarily incorporates the Confrontation Clause of the Sixth Amendment. *See, e. g., United States v. Bailey*, 581 F.2d 341, 350 (3rd Cir. 1978). Nonetheless, for analytical purposes, the Court will first focus on the evidentiary requirements before addressing the constitutional considerations since not all of the proffered statements satisfy the provisions of Rule 804(b)(5).

2. Rule 804(b)(5) provides:
 A statement not specifically covered by any of the foregoing exceptions but having

vailable and the proffered testimony does not meet one of the traditional exceptions to the hearsay rule. The theory underlying both this rule and Rule 803(24) (residual application when declarant is available) was set forth by Judge Weinstein:

> It [the Supreme Court] recognized that not every contingency can be treated by detailed rules, that the hearsay rule has never been a closed system and should not be (for it would be presumptuous to assume that all possibilities and new developments have been foreseen), and that, in a particular case, hearsay evidence which does not fall within one of the exceptions may have greater probative value than evidence which does. 4 *Weinstein's Evidence,* ¶ 803(24)[01] pp. 803–241, 242.

In essence, the residual exceptions incorporate the analysis of the Fifth Circuit holding in *Dallas County v. Commercial Union Assoc. Co., Ltd.,* 286 F.2d 388 (5th Cir. 1961). In that decision, the Fifth Circuit affirmed the trial court's decision to admit into evidence a 58-year old unsigned newspaper article reporting a fire as evidence that the fire occurred. Although the newspaper article did not fit any of the classic hearsay exceptions, the Court of Appeals later explained its decision in *Dallas County* as resting on the principle that "the primary criteria for permitting the introduction of otherwise inadmissible hearsay [are] elements of necessity and trustworthiness." *Muncie Aviation Corp. v. Party Doll Fleet, Inc.,* 519 F.2d 1178, 1182 (5th Cir. 1975).

Under Rule 804(b)(5), six conditions must be satisfied prior to admission:

(1) the declarant must be unavailable;[3]

(2) the statement must have circumstantial guarantees of trustworthiness equivalent to the first four exceptions in Rule 804(b);

(3) the statement is offered as evidence of a material fact;

(4) the statement must be more probative on the point for which it is offered than any other evidence that the proponent reasonably can procure;

(5) introduction of the statement must serve the interests of justice[4] and the purposes of the Federal Rules;

(6) the proponent of the evidence to be offered must have given his adversary the notice required by the rule. *United States v. Bailey, supra,* at 346.

As to all proffers under Rule 804(b)(5), the Court finds that the declarant is unavailable, the statements are offered as evidence of a material fact, and that the requisite notice has been given. The remaining requirements as to each proffer will be discussed individually in relation to the facts surrounding that proffer.

The first line of the defense is that the statements do not possess the equivalent circumstantial guarantees of trustworthiness contained in the other exceptions to Rule 804. Thus, the starting point for this analysis is to evaluate the inherent circumstantial guarantees of trustworthiness possessed by the bench mark exceptions, so that the standard against which the proffered statements are to be measured may be determined.

Rule 804(b)(1) exempts from the hearsay rule the generic class of "former

---

equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party suffi-

ciently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

**3.** "Death has been the most obvious and irreversible form of unavailability." 4 *Weinstein's Evidence,* ¶ 804(a)[01], p. 804–39.

**4.** *See,* Part III, *infra.*

testimony", its circumstantial guarantee of trustworthiness being that the "former testimony" has been subjected to the crucible of cross-examination. Rule 804(b)(2) exempts the "dying declaration" from the hearsay rule, because the circumstances of belief of impending death seem to obviate any motive on the part of the declarant to misstate the truth. More realistically, the dying declaration is admitted, because of compelling need for the statement rather than any inherent trustworthiness. Similarly, Rule 804(b)(3) (statement against interest) and Rule 804(b)(4) (statement of family or personal history) each contain circumstantial guarantees of trustworthiness, because the contents of the statements are such that they would not be made unless they were true.

The hallmark of these generic exceptions to the hearsay rule is that each is considered to have greater reliability than that possessed by ordinary hearsay. As Judge Mansfield noted in his dissenting opinion in *United States v. Medico,* 557 F.2d 309, 319 n. 1 (2d Cir. 1977), *cert. denied* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977): "The foundation for all hearsay exceptions is circumstantial trustworthiness in the absence of cross-examination."

The government seeks to demonstrate the circumstantial trustworthiness of the Underhill statements by relying on independent, corroborating evidence. *See, United States v. Ward,* 552 F.2d 1080, 1082–1083 (5th Cir. 1977), *cert. denied,* 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977); *United States v. Garner,* 574 F.2d 1141 (4th Cir. 1978), *cert. denied* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1979); and *United States v. West,* 574 F.2d 1131 (4th Cir. 1978).

 The defense contends, on the other hand, that while corroboration may be utilized to support a finding of circumstantial guarantees of trustworthiness, the decision must not be based on corroboration alone. As set forth in *United States v. Bailey, supra* at 349:

Since the rule is designed to come into play when there is a need for the evidence in order to ascertain the truth in a case, it would make little sense for a judge, in determining whether the hearsay is admissible, to examine only facts corroborating the substance of the declaration. Such an analysis in effect might increase the likelihood of admissibility when corroborating circumstances indicate a reduced need for the introduction of the hearsay statement. We do not believe that Congress intended that 'trustworthiness' be analyzed in this manner.

Consequently, the defendants urge that the Court must inquire into the declarant's motive, interest, general credibility, and all other circumstances which affect his statement.

 In the determination of whether a statement proffered under Rule 804(b)(5) has circumstantial guarantees of trustworthiness equivalent to the other exceptions, this Court will employ a two-part analysis. The first step will analyze the declarant and the circumstances surrounding his statement. This portion of the analysis will inquire into the declarant's relationship with the party against whom the statement is offered, and his motive to speak truthfully about the facts observed. The nature in which the statement was given, and the declarant's opportunity to observe the episode set forth in the statement are also subjects of inquiry. *See, United States v. Bailey, supra* at 349; *United States v. Medico, supra,* 557 F.2d at 315; 4 *Weinstein's Evidence,* ¶ 803(24)[01], p. 803–247. Although the factors denominated above are not meant to be exclusive, the purpose of this analysis is to establish whether the statement itself manifests circumstantial guarantees of trustworthiness equivalent, at least, to the other Rule 804 exceptions. While the Court does not seek to limit its inquiry to the statement itself, it does note that with the exception of Rule 804(b)(3) (statements against penal interest) the other exceptions to Rule 804 are admitted without corroborating evidence, because the reliability of the statement itself has been

judicially accepted without demand for independent corroboration.

The second part of the Court's analysis is to determine whether there is independent evidence to corroborate the statement. In effect, this analysis looks outside the statement to determine circumstantial guarantees of trustworthiness, while the first inquiry seeks to satisfy the same bench mark from within the statement.

Returning to the initial inquiry, the proffered statements are the grand jury testimony of the declarant and transcriptions of his interview by agents of the F.B.I. While the transcriptions are conceded to be correct transcripts of the declarant's statements, there is substantially more dispute over the truthfulness of the statements themselves.

Roger Underhill and defendant Thevis were partners in Cine-matics, Inc., a corporation which controlled much of the pornographic "peep shows" throughout the country. From the evidence, it appears that Underhill valued his interest at approximately $500,000, and that he believed that he was forced to sell that interest for $365,000, of which he eventually only received $140,000. Underhill attributed this loss to defendant Thevis, and as a result, the declarant filed a civil RICO action, 18 U.S.C. § 1964, in which he sought damages of $935,000 for the forced sale of his Cine-matics' interest as well as other wrongs which he imputed to his former partner. The damages claimed were later increased to $10,000,000 by amendment. At the time the statements were made by the declarant, the civil suit was pending, and thus, the statements could be construed as self-serving.

Nor did Mr. Underhill appear to have great respect for the truth when it did not serve his purposes. In 1970, while working for defendant Thevis at Peachtree News, he told officers investigating the Hanna murder a different story from that set forth in his grand jury and F.B.I. statement.[5] Similarly, in August, 1972, while employed by Global on a part-time basis, Underhill was subpoenaed by a federal grand jury investigating potential tax crimes committed by Thevis and his then wife. Upon being sworn, and after receiving immunity, Underhill promptly committed perjury if his later testimony in his deposition taken in the civil RICO action is believed.

In 1977, Underhill received immunity from prosecution under 18 U.S.C. § 6003; prior to agreeing to cooperate with the government, however, he bargained for what can be best characterized as a criminal's version of a letter to Santa Claus. Among the concessions that Underhill desired for his testimony were: plastic surgery, civil immunity for past acts, a ten percent reward from I.R.S. tax recoveries from defendant Thevis, priority over any federal tax lien for execution of his anticipated civil RICO judgment, new identity replete with military PX privileges and a new pickup truck.

Were Roger Underhill a witness, his credibility would have been attacked under Rule 609, for he possessed a long record of past criminal activity. Nor would the defense concede Underhill's mental competency; in 1975, an attorney representing him in the Louisville arson sought to plead an insanity defense on the ground that the declarant was incapable of cooperating with his attorney.[6]

While the Court acknowledges the darker nature of Underhill's character, it is unwilling, as the defendant urges, to hold as a matter of law that his statements are incredible. In fact, the Court finds that Underhill lied in regard to the Hanna investigation and committed perjury before the

---

**5.** Underhill evidently told still a third version of the Hanna murder to Gene Matthews, an investigator for the Fulton County District Attorney's Office.

**6.** In his affidavit, J. Roger Thompson, Esq., stated that Roger Underhill had difficulty focusing his attention on the elements essential to the defense of the crime. Subsequently, Thompson testified that Underhill seemed to have a mental fixation on two different subjects: (1) the government's prosecution of him, and (2) Mike Thevis and his efforts to kill Underhill.

grand jury to aid his friend, partner, and benefactor—defendant Thevis.

■ The declarant's testimony in the grand jury was given after the absolution of immunity was conferred and the Court finds that Underhill had a strong motive to testify truthfully, since only untruthful testimony would have subjected him to criminal liability. Furthermore, the Court notes that at the time of the grand jury testimony and the F.B.I. interview, Underhill's civil RICO suit against defendant Thevis was then pending. The Court finds that the pending civil litigation gave further motive to the declarant to testify truthfully, since he was sufficiently familiar with the judicial process to realize that prior inconsistent statements could be used to impeach his credibility. Thus, to the extent that his testimony in the criminal RICO action was proved untruthful, it would be utilized to discredit his civil RICO testimony.

Finally, the statements themselves boost their own credibility. First, the statements were recorded and accurately transcribed; consequently, the traditional fear that the declarant's statement is garbled by the testifying witness is nonexistent. Secondly, the statements bespeak their own authenticity; each is replete with the detail to which only a participant and confidante would have access.

Prior to adoption of the Federal Rules of Evidence, Judge Weinstein states that "the admissibility of hearsay evidence was resolved by assessing relevancy, need and reliability instead of insisting on compliance with a particular class exception. The same approach should be used on proffers made pursuant to Rule 803(24)."[7] 4 *Weinstein's Evidence,* ¶ 803(24)[01], p. 803–247.

There is no question of the relevancy of the proffered statements, and the need for the testimony is self-evident.[8] As to the reliability possessed by the statements, the Court is convinced that four of the proffered statements possess circumstantial guarantees of trustworthiness equivalent to the other exceptions under Rule 804, and each will be considered separately, *infra.*

■ The grand jury statement was sworn testimony reported by a certified court reporter. The Court finds that it was Underhill's best interest to testify truthfully. Not only would untruthful testimony subject him to perjury charges, but it would also jeopardize the prospects of his civil RICO suit. To the extent that the grand jury statement was made without motive to misstate the truth, it certainly approaches the circumstantial guarantees of trustworthiness contained in the dying declaration. *See,* Rule 804(b)(2). The Court reaches the same conclusion, in general, as to the F.B.I. interview. Although unsworn, the Court finds that the statement was made with motive to testify truthfully, and the vast detail provided in the statement vouches for its reliability.

Moreover, the Court notes that no agreement was ever consummated whereby the government would shield Underhill from civil liability for his past actions. Absent such an agreement, much of the proffered statements contain admissions against Underhill's pecuniary interest,[9] and to that extent the proffered statements certainly possess circumstantial guarantees of trustworthiness equivalent to that exception. Rule 804(b)(3).

**7.** Although Judge Weinstein was discussing Rule 803(24), the same standards and evidentiary principles would be applicable to assessments under Rule 804(b)(5). 4 *Weinstein's Evidence,* ¶ 804(b)(5)[01], 804–102.

**8.** Indeed, Underhill's murder makes the defense argument that Rule 804(b)(5) is to be limited to only "exceptional" cases largely academic. In fact, the Court is hardpressed to think of a more "exceptional" situation than that presented by the instant issue.

**9.** While the applicable Georgia statute of limitations would apparently bar any tort liability for Underhill's participation in either the Hanna or Mayes' murders, the Court is aware of no principle which would have barred Underhill's inclusion as a civil defendant in either the Louisville arson, the Fayetteville arson, or the Simpson Street insurance fraud at the time the proffered statements were made.

Turning to the second part of the Court's analysis, the Court will review each proffer individually to determine if corroborating evidence enhances the circumstantial guarantees of trustworthiness.

## THE HANNA MURDER

■ Succinctly, in the proffered statements, Underhill related how he was called at home by defendant Thevis on the morning of November 13, 1970. Arriving at the Thevis complex, Underhill was shown Hanna's car, and Thevis indicated that he had killed Hanna, the body of whom he had locked in the trunk. Underhill pulled the trunk lock, so that Thevis could retrieve the car keys; then, the declarant followed Thevis in Hanna's car to the Atlanta airport where the car and victim were abandoned. The pair then returned to the office where Underhill melted the murder weapon, his tools, and certain coins from Hanna's body in a stainless steel pan. That evening, Underhill threw the pan with the melted remnants into the Chattahoochee River.

The statement is corroborated by Underhill's wife who testified that she remembered the telephone call on the morning of November 13, 1970. That the trunk lock was pulled was established by the photographs and investigating officers who found the automobile in the airport parking lot. Photographs of Hanna's body in the trunk verified Underhill's description of the body's position and the clothes on the body. A Mexican Centavo was found on Hanna's body. After the grand jury testimony and the F.B.I. interview, Underhill identified the place where he disposed of the pan and the melted gun. At that location, F.B.I. divers located a stainless steel pan in which was discovered two metal shanks, a molten "blob", and four Mexican Centavos.

Experts for both the government and the defense concede that the shanks are remnants of screwdrivers, one of which bears the initials R.D. The last initial is partially obscured, but all parties agree that the third initial is either a "U," "V," or "W".

Although the experts disagree over whether the metal "blob" could have originally been a revolver, the Court finds the presentation of the government's expert more thorough and convincing. The Court finds as a matter of fact for the purposes of this preliminary question that the trace elements contained in the metal "blob" are consistent with those expected to be found in a revolver which has been subjected to intense heat, melted with other metals, and then immersed in the Chattahoochee for several years.

Finally, the Court notes that Underhill's statement to defendant Thevis' admission as to his part in the Hanna slaying is corroborated by defendant Thevis' statement to Leon Walters and by the defendant himself on the "shoemike" tapes.

Thus, the Court finds as a matter of law that the proffered Underhill statements as to the Hanna murder contain circumstantial guarantees of trustworthiness equivalent, at least, to the dying declaration. This reliability is manifested not only in the statement itself, but also by the corroborating evidence which substantiates Underhill's account in all material respects. The Court further finds that the statements are more probative than other evidence which the government could reasonably procure and that the admission of these statements serves the general purposes of the Federal Rules of Evidence in that admission of the proffer presents to the jury relevant, reliable, needed evidence which is necessary for the ascertainment of the truth and a just determination. Rule 102.

## THE ANTHONY EXTORTION

■ In March, 1971, Joseph Anthony was severely beaten in Houston, Texas. The government alleges that the beating was administered by the enterprise to force Anthony to abandon a valuable pornographic distributorship which he held in that city.

Underhill's statement is proffered, but it is severely limited in scope. The declarant relates that defendant Thevis requested that he have Anthony beaten, but Underhill declined. Thereafter, Underhill reports that Robert Mitchum was hired to perform

the act and that Anthony actually was beaten.

The difficulty with this proffer is that Underhill's knowledge as to the employment and execution of the Anthony beating is necessarily hearsay, for by his own admission he declined to participate. Since Underhill is not relating something that he did or saw, he is not a competent witness. Furthermore, the source of his knowledge as to the crime is unidentified, and thus, the Court is unable to evaluate the competency of that unnamed declarant.

Nor is Underhill's statement corroborated by any evidence other than the fact that Joseph Anthony was beaten and that an enterprise subsidiary had recently lost a valued pornographic distributorship.

The Court finds as matter of fact that the proffered testimony as to the Anthony beating is almost entirely hearsay [10] and that it does not have circumstantial guarantees of trustworthiness equivalent to the other Rule 804 exceptions.

### THE FAYETTEVILLE ARSON

The proffer concerning the Fayetteville arson is relatively simple. In 1972, Global had a bookstore, "Paris Books" with movie machines in Fayetteville, North Carolina. That particular location was overshadowed by a competitor, the "Village Bookstore." Underhill relates how he and defendant Thevis decided to burn out this competitor, and for that purpose they traveled to Fayetteville. The two visited the store, and then returned to Atlanta. Underhill then hired and instructed Mahar who actually performed the job; Underhill was not present at the time that Mahar burned the competitor, and his only knowledge of the actual arson comes from Mahar.

Underhill's statement is corroborated in part by independent evidence. Herman Womack testified that he owned the "Village Bookstore." Womack had a conversation with defendant Thevis in which the defendant claimed that Fayetteville was his town and that Womack would either have to sell the "Village Bookstore" or lose it. Subsequently, the offending bookstore burned, but the official investigation revealed no evidence of arson.

 Insofar as Underhill's statement concerns activities in which he participated or viewed, the proffered statement has circumstantial guarantees of trustworthiness equivalent, at the least, to the dying declaration, Rule 804(b)(2) or statements against interest. Rule 804(b)(3). However, the Court has more difficulty with the limited portion of the Underhill statements in which the declarant relates what Mahar told him about the arson. First, there is no corroboration of Mahar's statement to Underhill other than the building burned shortly after Womack and defendant Thevis had their business discussion. Secondly, the truth of the statement is a matter obviously beyond the scope of Underhill since by his own admission he was not present at the scene. Finally, the Court is aware that Mahar was an indicted coconspirator and upon the requisite showing under Rule 801(d)(2)(E), his statement could have been admitted against all other conspirators. Nonetheless, this particular coconspirator's statement is contained in a Rule 804(b)(5) statement, and absent clear corroborating evidence, the Court is reluctant to hold that the coconspirator's admission possesses the requisite circumstantial guarantees of trustworthiness to pass evidentiary muster. The Court finds no corroborating evidence as to Mahar's statement and holds that it is inadmissible under Rule 804(b)(5).

As to the remainder of this proffer, the Court notes that of three participants, defendant Thevis has the privilege against self-incrimination and Mahar is dead. Thus, the Underhill statements are the most probative evidence which the government could reasonably procure. Finally, the Court finds that admission of the limited portion of the proffers approved by the

---

**10.** In effect, this proffered statement presents a double hearsay problem under Rule 806, since the actual proffer is hearsay under Rule 804(b)(5) containing more traditional hearsay within it.

Court will serve the general purposes and policies underlying the Federal Rules of Evidence.

## SIMPSON STREET MAIL FRAUD

■ In his statements, Underhill described how he and Mahar burned an abandoned house for defendant Thevis by using gunpowder as an accelerant. The statements are limited to Underhill's personal participation, and they are corroborated by the fire marshall's investigation and the testimony of Leon Walters. The Court finds that the statements contain circumstantial guarantees of trustworthiness equivalent to either the dying declaration, Rule 804(b)(2) or the statement against pecuniary interest. Rule 804(b)(3). The admission of the proffered statements will serve the policies of the Federal Rules, and the statements are the most probative evidence which the government could reasonably procure.

## THE MAYES MURDER

■ In the statements proffered by the government, Underhill states that Thevis initially approached him in December, 1972 to kill Jimmy Mayes, a former employee who was then making threats as to Thevis' life. Underhill was reluctant to personally perform the murder, so he recruited Mahar. To pay for the murder, Underhill received $3500 from Leon Walters.

On the night that Mahar and Michael Bryson killed Mayes by placing a plastic bomb in his van, Underhill related that he was at home. Upon receiving a call from Mahar that the deed had been performed, Underhill met Mahar and paid him $2500. The next day, according to the transcripts, Underhill collected small remnants of Mayes' shattered body which he showed to both Walters and Thevis.

Underhill's statements are corroborated in detail by the testimony of both Leon Walters and Michael Bryson, Mahar's confederate. In light of Bryson's corroborating testimony, the Court has no difficulty in holding that the proffered testimony contains circumstantial guarantees of trustworthiness equivalent to the other Rule 804 exceptions. As Underhill was the link between defendant Thevis and Mahar, the statements are the most probative statements which could reasonably be offered. Furthermore, admission of the statement certainly supports the policy and general purposes of the Federal Rules of Evidence as discussed earlier.

## II

■ As noted earlier, a condition to admission under Rule 804(b)(5) is that admission of the proffered statement be "in the interests of justice." This requirement, of necessity, incorporates the Confrontation Clause of the Sixth Amendment. *United States v. Bailey, supra* at 350; *United States v. Love,* 592 F.2d 1022, 1027 (8th Cir. 1979) at 1027. Thus, the question is simply stated, but more difficultly answered: does admission of the proffered testimony violate the defendants' right to confrontation guaranteed by the Sixth Amendment.

■ The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Taken literally, that constitutional guarantee would exclude every form of hearsay and hearsay exception, but as Judge Medina noted in *United States v. Kelly,* 349 F.2d 720, 770 (2d Cir. 1965), *cert. denied* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1968):

> The application of this doctrine, like the principles relating to dying declarations, prior testimony of deceased witnesses, and indeed virtually all the exceptions to the hearsay rule, does not involve any deprivation of the right of confrontation as the Sixth Amendment has been interpreted and construed.

In *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970), the Supreme Court recognized that "the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots;" however, while they both are "designed to protect similar values, it is quite a different thing [entirely] to suggest that

the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law." *California v. Greene,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933–1934, 26 L.Ed.2d 489 (1969).

In *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972), the Supreme Court set forth the standard for the evaluation of admissible evidence under a hearsay exception after a confrontation objection has been lodged:

> The focus of the Court's concern has been to insure that there "are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." *Dutton v. Evans, supra* [400 U.S.], at 89 [91 S.Ct. [210] at 220], 27 L.Ed.2d 213, and to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement," *California v. Greene, supra,* 399 U.S. at 161 [90 S.Ct. [1930] at 1936]. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these "indicia of reliability" referred to in *Dutton.*

In *Medico, supra* at 319, n. 1, Judge Mansfield paraphrased Dean Wigmore in noting that "the foundation for all hearsay exceptions is circumstantial trustworthiness in the absence of cross-examination." In *Mancusi,* the Supreme Court stated that the Confrontation Clause was also directed at the indicia of reliability contained in the statement of the unexamined, unconfronted declarant.

Notwithstanding the Supreme Court's protestations in *California v. Greene, supra,* to the contrary, the net effect of the *Mancusi* holding is to incorporate and merge the hearsay rule with its attendant exceptions into the Confrontation Clause of the Sixth Amendment. The result of this merger is that otherwise admissible hearsay is subjected to still further constitutional scrutiny to determine if the proffered hearsay has

sufficient "indicia of reliability" to avoid offending the Confrontation Clause of the Sixth Amendment.

Since the Supreme Court has yet to evaluate the *Mancusi* standard in the context of a proffer under Rule 803(24) or Rule 804(b)(5) to determine if the proffered statements will violate the right to confrontation if admitted, this Court does not feel constrained to apply that standard to the issue pending. The Court is hesitant to apply the *Mancusi* standard, because it perceives that the application of "the indicia of reliability" test is, in reality, no constitutional analysis whatsoever in a Rule 804(b)(5) context.

The Federal Rules of Evidence regulate the procedure of the taking and admission of evidence in federal courts. Under those rules, there are certain exclusionary rules which "facilitate the ascertainment of the facts by guarding against evidence which is unreliable or is calculated to prejudice or mislead." *McCormick on Evidence,* § 72 (1972) (discussing exclusionary rules prior to adoption of Federal Rules of Evidence). Among those exclusionary rules are the opinion rule, Rule 701, the rule rejecting proof of bad character as evidence of a crime, Rule 404(b), the original writing rule, Rule 1001, and the hearsay rule, Rule 802. However, there are exceptions to those rules when the proffered evidence has badges of reliability which exempt it from the exclusionary rule's evidentiary prohibition. The chief example of those exceptions are, of course, the hearsay exceptions set forth in Rules 803 and 804.

With the exception of the two residual exceptions, Rules 803(24) and 804(b)(5), each of the class exceptions has been removed from the hearsay rule's exclusionary ban, because for each class exception judicial thought, analysis, and experience has determined that the evidence falling within that particular hearsay exception is reliable, competent evidence on which a verdict may be based.

The purpose of Rules 803(24) and Rule 804(b)(5) is simply to provide an evidentiary vehicle by which proffered hearsay

statements which have "circumstantial guarantees of trustworthiness" equivalent to the other exceptions may be admitted into evidence. As two of the purposes underlying the Federal Rules of Evidence are that "the truth may be ascertained and proceedings justly determined," Rule 102, the residual hearsay exception in Rule 804(b)(5) would appear to be the embodiment of the purposes and policies underlying the federal evidentiary rules.

 It is because the evidentiary requirements of Rule 804(b)(5) require the proffered statement have "circumstantial guarantees of trustworthiness" and effectuate the policies underlying the federal rules, that this Court believes application of the *Mancusi* "indicia of reliability" standard inappropriate. By definition that constitutional standard is met prior to tender of the proffered Rule 804(b)(5) statement, and, thus, the actual constitutional analysis to determine if the Confrontation Clause is controverted is nothing more than an empty gesture. So that the Confrontation Clause will not be construed out of the Constitution by the application of the *Mancusi* standard in this context, the Court must reject it, for the Court perceives that right as a substantive right of trial procedure guaranteeing both presence and cross-examination of the accuser by the accused. *See, United States v. West,* 574 F.2d 1131, 1138 (4th Cir. 1978) (J. Widener dissenting).

The Supreme Court recognized the purpose of the Confrontation Clause in its often-quoted passage in *Mattox v. United States,* 156 U.S. 237, 242, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895):

> The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

 As previously discussed in Part I, both statements were made after Roger Underhill received immunity under 18 U.S.C. § 6003 and actively began cooperating with the government. As the defendants correctly contend, the declarant was the chief architect of the government's case. To the extent his statements were critical to the preparation and return of the indictment, the pursuit of evidence, and other matters relating directly to the guilt or innocence of the accused, the statements are but one step removed from the *ex parte* affidavits and depositions which the Confrontation Clause was adopted to preclude. In light of the fact that the original indictment included four counts involving two different attempts to murder Underhill, the government would have been naive not to recognize the distinct possibility that a third attempt might succeed prior to trial. That the government recognized this possibility is established by the testimony of Mr. Harvey Harkness, Esq., the Assistant United States Attorney formerly assigned to the case, and Mr. Paul King, the case agent for the F.B.I.

Like the *ex parte* affidavit or deposition which the right to confrontation is directed against, the statements of Roger Underhill were taken by the prosecution for use in the pending criminal indictment against defendant Thevis. Although there is no evidence to suggest that either statement was actually taken for use at trial, the Court holds that the government was aware that a third attempt on the declarant's life might preclude live presentation of his testimony. Since at the time the statements were made, Underhill was actively cooperating under a grant of immunity, and this conclusion is even stronger. Notwithstanding the "indicia of reliability" which the proffered statements possess, their use in this trial would bar the right to confronta-

tion secured by the Sixth Amendment since their use would be tantamount to prosecution by affidavit or deposition.

## III

Because the Court holds the defendant's right to confrontation is vitiated by the admission of the proffered statements, the final preliminary question to be addressed is whether that right has been waived.

The last issue presents an issue of first impression. The government has proffered the Rule 804(b)(5) statements in its case as to the first two RICO counts. In Count X, defendants Fidelity,[11] Thevis and others are charged with conspiring to violate Roger Underhill's civil right to testify in this trial by murdering him. That count is properly joined with the two RICO counts, because the Underhill slaying is also a predicate act of racketeering in those counts. *United States v. DePalma,* 461 F.Supp. 778 (S.D.N.Y.1978). Thus, before the Court can admit the proffered statements as to Counts I and II, it will have to find that the declarant is unavailable to testify because of acts of the defendants. Thus, the question presented to the Court is whether the defendants in Counts I and II waived their right of confrontation of Roger Underhill by causing him to become unavailable after learning that he would testify against them in this trial.

■■■ The right of confrontation is a substantive right of trial procedure personal to the accused. *See, Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). As the Eighth Circuit recognized in *United States v. Carlson,* 547 F.2d 1346, 1357 (8th Cir. 1976), *cert. denied* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977):

> As such, this right, like other federally guaranteed constitutional rights, can be waived by the accused. *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); 5 J. Wigmore, *Evidence, supra* § 1398, at 142–143. To con-

stitute a valid waiver there must be an 'intentional relinquishment or abandonment of a known right or privilege' by the accused. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

■■■ The defendant's right to confrontation may be impliedly waived by conduct which causes the declarant to become unavailable. In *Carlson, supra,* the declarant testified before the grand jury, but refused to testify at trial after he was threatened by the defendant. The government then offered the declarant's grand jury testimony under Rule 804(b)(5). The trial court admitted the testimony; after conviction the defendant appealed, arguing that his right to confrontation had been violated by the admission of the grand jury testimony. In upholding the conviction, in a persuasive and perceptive opinion, the Eighth Circuit held that no confrontation issue was preserved, because the defendant's conduct in causing the declarant to become unavailable operated as an implied waiver of his Sixth Amendment rights under the Confrontation Clause.

In following *Carlson,* this Court adopts no more than the principle that the defendant's right to confrontation may be impliedly waived by conduct which causes the declarant to become unavailable.

■■■ Defendant Thevis urges that the *Carlson* analysis is inapposite, for it rests on a finding that the defendant in that case caused the declarant to become unavailable. To make such a finding in this case, the defendant argues, would be to invade the province of the jury as to Count X. In making such an argument, the defendant mispreceives the role of the Court in ruling on the admissibility of evidence.

As to Count X, it is the province of the jury to determine the guilt or innocence of the defendants, and if a verdict of guilty is returned the evidence must establish that guilt beyond a reasonable doubt. However,

---

11. Fidelity is the corporate parent of Global, both of whom with defendant Thevis are charged in Counts I and II.

how the Court perceives the evidence as to Count X affects rulings on the admissibility of evidence as to Counts I and II, since the Court's perception of the facts of Count X are the predicate for ruling on the admissibility of the proffers in Counts I and II. In making this ruling on admissibility under Rule 104(a), the Court does not invade the province of the jury, for the guilt or innocence of the accused in Count X is still a question addressed solely to the jury.[12]

No court has yet to rule on the evidentiary standard to be applied when the question of whether the right to confrontation has been waived by conduct inimical to that right. Since the issue arises in the context of a ruling on the admissibility of evidence and not with the reliability of criminal jury verdict, the Court does not feel constrained to apply the "reasonable doubt" standard, *see, Lego v. Twomey,* 404 U.S. 477, 486, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

■ Waiver of other constitutional rights is generally measured by a preponderance of the evidence standard. *Lego v. Twomey, supra* (voluntariness of confession, waiver of Fifth Amendment rights); *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (consensual search, waiver of Fourth Amendment rights). Notwithstanding the lesser standard approved by the Supreme Court in those constitutional waiver situations, this Court believes that a higher standard of proof is appropriate in this case.

Unlike the confession or consensual search cases where generally only the waiver of the right is inferred from the defendant's conduct, the waiver of the right to confrontation presents a situation where not only recognition of the right to confrontation is inferred from conduct, but the subsequent waiver of that right as well.

■ To validly waive a constitutional right, there must be an intelligent abandonment of that right. *Johnson v. Zerbst, supra* at 464, 58 S.Ct. 1019. "Intelligence" requires recognition of the constitutional right, while "abandonment" signifies conscious relinquishment. To comport with this requirement, the Court holds that the waiver of the right to confrontation by conduct causing the declarant to become unavailable must be established by clear and convincing evidence.

■ Applying that standard to the government's showing and the defense's *in camera*[13] presentation, it must first be acknowledged that there is no evidence in the record that Fidelity had any responsibility for the murder of Roger Underhill. Consequently, there can be no finding that either Fidelity or Global waived its right as an accused to confrontation.

■ As to defendant Thevis, the Court finds that the F.B.I. interview of Roger Underhill was released by the government to codefendants of Thevis in August, 1978. The transcribed interview details the scope of Underhill's expected testimony in this case, then pending against defendant Thevis. Defendant Thevis had a copy of the Underhill transcript under his control at the time of his arrest on November 9, 1978. That copy contained over 140 Thevis fingerprints, and the Court finds that defendant Thevis had read the interview and was aware of its contents.

Prior to October 25, 1978, defendant Thevis conspired with Anna Jeanette Evans, Alton Bart Hood and others to kill Underhill to prevent his testimony in the trial of this case. Both individuals harbored defendant Thevis, and each aided in the establishment of new, false identities for Thevis.

---

12. Indeed, because the Court has no intention of intruding intentionally or unintentionally into the jury's deliberations as to Count X, its announced ruling is limited to admissibility of the proffered evidence. The scope of the inquiry and the factual findings made by the Court to reach that ruling were not expressly enunciated until this opinion. To further protect the jury, this opinion shall be sealed until either a verdict is returned or mistrial declared.

13. The defense presented their evidence as to Count X *in camera,* so that the government would not have the period intervening this showing and the defense case to prepare their rebuttal.

At an earlier stage in the conspiracy, both Hood and Evans ordered the manufacture of silencers for pistols, and each inquired as to whether a 30.06 could be fitted with a silencer.

On October 24th, Bart Hood traced an automobile tag on a car owned by Underhill, using his contacts within the South Carolina highway department. The tag on Underhill's car was registered in another name. That same day, Jeanette Evans expressed interest in a piece of property owned by Underhill, a man with whom she had eschewed contact a year earlier. Evans was particularly interested in the location of the land and surrounding development.

On October 25, 1978, defendant Thevis and another individual were seen on the Underhill property approximately twenty minutes before Underhill and Issac Galanti were killed while walking over the declarant's land. Although both men were killed by twelve gauge shotgun wounds, a 30.06 rifle was also fired at the pair.

After October 25, 1978, defendant Thevis left Atlanta, and he did not return until after his apprehension on November 9th. Bart Hood returned to South Carolina on October 26th, and he subsequently reported the theft of a twelve gauge shotgun and 30.06 rifle from his car.

In summary, the Court finds clear and convincing evidence that defendant Thevis was aware that Roger Underhill would be a witness in the then-pending trial of this case. To prevent that testimony, defendant Thevis and others including defendants Hood and Evans conspired to murder Underhill, and on October 25, 1978, the objective of the conspiracy was successfully attained.

The Court holds as a matter of law that the declarant is unavailable because of defendant Thevis' actions, and as a result of those actions, defendant Thevis waived his right to confrontation.

To further safeguard the defendant's constitutional rights, the Court will review this decision at the close of the case. If at the close of the defense's case, the evidence will not support the clear and convincing standard, the Court will enter an order striking the admitted statements and such other appropriate relief as is necessary.

Accordingly, the proffered statements of Underhill as to the Hanna murder, the Fayetteville arson as limited, *supra,* the Simpson Street Mail Fraud, and the Mayes murder are admitted against defendant Thevis under Rule 804(b)(5) subject to all evidentiary objections. This order shall remain sealed until a verdict is returned or a mistrial declared.